IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

* * * * * * * * *

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. ROGER LEMMON, PATRICK COLE and KYLE GUNDERSON, | ) ) ) ) |
| | Civil No. 2:02-CV-904 BSJ |
| Plaintiffs, | ) ) |
| | **MEMORANDUM OPINION & ORDER** |
| vs. | ) ) |
| ENVIROCARE OF UTAH, | ) ) ) |
| Defendant. | ) ) |

┌─────────────────────────────────┐
│            **FILED**            │
│   CLERK, U.S. DISTRICT COURT    │
│     April 9, 2008 (4:52pm)      │
│        DISTRICT OF UTAH         │
└─────────────────────────────────┘

* * * * * * * * *

Plaintiffs Lemmon, Cole and Gunderson (the "Relators") filed their Second Amended

Complaint on November 10, 2005 (dkt. no. 113).   Defendant Envirocare of Utah ("Envirocare")[1]

responded with a series of dispositive motions: (1) a Motion to Dismiss Roger Lemmon as

Relator in Second Amended Complaint (renewed), filed December 5, 2005 (dkt. no. 115); (2) a

Motion to Dismiss Second Amended Complaint Pursuant to Rule 12(b)(6) (renewed), filed

December 5, 2005 (dkt. no. 116); and (3) a Motion to Dismiss Second Amended Complaint

Pursuant to Rule 9(b), filed December 5, 2005 (dkt. no. 117).  The court heard these motions on

February 17, 2006,[2] and took the matter under advisement.  (*See* Minute Entry, dated February

---

[1]In February of 2006, Envirocare of Utah, Inc. joined with two other companies, BNG America and Scientech D&D, to form Energy*Solutions*, LLC.  The relevant contracts and other documents in this case predate that change and refer to "Envirocare," not "Energy*Solutions*."  To avoid confusion on this record and for the sake of consistency, the court will continue to refer to the defendant as "Envirocare," noting that none of the parties have raised the question of the transfer of Envirocare's interests to the new entity under Fed. R Civ. P. 25(c).

[2]Also calendared for hearing was the Plaintiffs' Renewed Motion for the Substitution of Jolene Lemmon for Relator Roger Lemmon, filed April 14, 2005 (dkt. no. 86).  (*See* Notice of Hearing, dated December 14, 2005 (dkt. no. 121); Order Extending Time, filed January 9, 2006 (dkt. no. 128) (resetting hearing for February 17, 2006).)

17, 2006 (dkt. no. 132).)

Having reviewed and considered the memoranda and exhibits submitted by the parties, and having heard and considered the arguments of counsel, the court now rules that Envirocare's motion to dismiss Roger Lemmon as a relator is denied, and Jolene Lemmon is substituted as a plaintiff; its Rule 12(b)(6) motion to dismiss the Second Amended Complaint is granted; and its Rule 9(b) motion to dismiss is granted in part.  The Second Amended Complaint is dismissed pursuant to Rules 9(b), 12(b)(6) and 8(a)(2), but the plaintiff Relators are granted leave to amend their pleading subject to the Rules and certain limitations prescribed by this court.

**The False Claims Act**

As the Supreme Court explains:

> Originally enacted in 1863, the False Claims Act (FCA) is the most frequently used of a handful of extant laws creating a form of civil action known as *qui tam*.  As amended, the FCA imposes civil liability upon "[a]ny person" who, *inter alia*, "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a). The defendant is liable for up to treble damages and a civil penalty of up to $10,000 per claim.  *Ibid.*  An FCA action may be commenced in one of two ways.  First, the Government itself may bring a civil action against the alleged false claimant.  § 3730(a).  Second, as is relevant here, a private person (the relator) may bring a *qui tam* civil action "for the person and for the United States Government" against the alleged false claimant, "in the name of the Government." § 3730(b)(1).

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 768-69 (2000) (footnote omitted);[3] *see also United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551 (1943) ("We think the chief purpose of [the False Claims Act] was to provide for restitution to

---

[3]As the Court notes, "*Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who pursues this action on our Lord the King's behalf as well as his own.'  The phrase dates from at least the time of Blackstone." *Stevens*, 529 U.S. at 768 n.1 (citing 3 W. Blackstone, *Commentaries* *160).

the government of money taken from it by fraud, and that the device of [a civil penalty plus

multiple damages] was chosen to make sure that the government would be made completely

whole.").

Upon notice from a *qui tam* claimant, the United States may elect to intervene and

assume "primary responsibility for prosecuting the action"; if the Government declines to do so,

the *qui tam* claimant (also known as the "relator") holds the "exclusive right to conduct the

action, § 3730(b)(4), and the Government may subsequently intervene only on a showing of

'good cause,' § 3730(c)(3)." *Id.* at 769.  The *qui tam* claimant (relator) receives a share of any

proceeds obtained through the action, generally ranging from 25 to 30 percent if the Government

does not intervene (depending upon the court's assessment of what recovery would be

reasonable), plus attorney's fees and costs.  *Id.* at 769-70 (citing 31 U.S.C. §§ 3730(d)(1)-(2)).

The FCA and similar statutes authorizing *qui tam* actions "provide a private citizen who

would otherwise have no judicially cognizable 'interest' in rights protected by particular federal

substantive provisions with an interest sufficient to give that individual the standing to sue to

enforce these provisions."  *Public Interest Bounty Hunters v. Board of Governors of Federal

Reserve System*, 548 F. Supp. 157, 161 (N.D. Ga. 1982) (citations omitted).

> The *qui tam* plaintiff thus becomes a "person aggrieved" by defendants' purported
> behavior who has suffered "injury" of the constitutional magnitude required to
> confer upon him a claim against the defendants.  *Qui tam* plaintiffs therefore stand
> in the position of "private attorneys general" whom Congress has "deputized" to
> enforce federal laws.

*Id.*

### Effect of the Death of Relator Roger Lemmon

Envirocare asserts that whatever the merits of relator Roger Lemmon's FCA claims may

be, those claims abated upon his death.  The Relators respond that Roger Lemmon's FCA claims

"belong to the United States of America," and are asserted on behalf of the Government.  Even if

those claims are deemed to be personal to Lemmon, the Relators argue that the relief

sought—including treble damages—is remedial rather than punitive in nature, and his claims

thus survive his death.

The Relators' first argument proves appealing in its simplicity.  The FCA's *qui tam*

provision authorizes "private persons" to bring a civil action for a violation of the FCA in the

Government's stead: "A person may bring a civil action for a violation of section 3729 for the

person and for the United States Government. The action shall be brought in the name of the

Government."  31 U.S.C.A. § 3730(b)(1).  "Courts have often liberally construed the FCA to

reach a wide range of fraud committed upon instrumentalities of the United States, but they have

always done so consistent with Congress' purpose in promulgating the Act, namely to protect

*government* funds and property from fraudulent claims for payment." *United States ex rel. DRC,*

*Inc. v. Custer Battles, LLC.*, 376 F. Supp. 2d 617, 636 (E.D. Va. 2005) (emphasis in original;

footnote omitted); *see also Rainwater v. United States*, 356 U.S. 590, 592 (1958) ("It seems quite

clear that the objective of Congress was broadly to protect the funds and property of the

Government from fraudulent claims, regardless of the particular form, or function, of the

government instrumentality upon which such claims were made.").[4]  Indeed, "the entire purpose

---

[4]The FCA was enacted in the wake of substantial pecuniary losses suffered by the Government as the result of fraud:

> The False Claims Act was originally adopted following a series of sensational congressional
> investigations into the sale of provisions and munitions to the War Department.  Testimony before the
> Congress painted a sordid picture of how the United States had been billed for nonexistent or
> worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the

(continued...)

of the FCA's *qui tam* provisions is to employ the help of individuals to uncover fraud against the government." *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 748 (9th Cir. 1993).  The FCA authorizes civil penalties and an award of three times "the amount of damages *which the Government sustains*" because of the fraudulent act.  31 U.S.C.A. § 3729(a) (emphasis added). The treble damages sought by the Relators in this case would be measured by the Government's loss.

The FCA motivates "a private individual [to] bring suit in federal court *on behalf of the United States*" by effecting a partial assignment of the government's damages claim to the relator.  *Stevens*, 529 U.S. at 768 (emphasis added). "While the False Claims Act recognizes that the relator should be awarded for initiating litigation which ultimately has a successful result, it also recognizes that the primary interest at stake in such litigation belongs to the government." *United States ex rel. Fox v. Northwest Nephrology Associates, P.S.*, 87 F. Supp. 2d 1103, 1109 (E.D. Wash. 2000).

> Although the partial assignment allows the relator asserting the government's injury to satisfy the requirements of Article III standing, it does not transform a *qui tam* action into the relator's "own case" . . . .  The FCA makes clear that notwithstanding the relator's statutory right to the government's share of the recovery, the underlying claim of fraud always belongs to the government. *See* 31 U.S.C. § 3730(c)(5) (providing that "the Government may elect to pursue *its claim* through any alternate remedy" (emphasis added)).  Accordingly, where the government chooses not to intervene, a relator bringing a *qui tam* action for a violation of § 3729 is representing the interests of the government and prosecuting the action on its behalf.  *See* 31 U.S.C. § 3730(b)(1); *see also United States v.*

---

[4](...continued)
necessities of war.  Congress wanted to stop this plundering of the public treasury.

*United States v. McNinch*, 356 U.S. 595, 599 (1958) (citations omitted); *see also United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968) ("Debates at the time suggest that the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." (citing Cong. Globe, 37th Cong., 3d Sess., 952-958)).

> *Schimmels (In re Schimmels)*, 127 F.3d 875, 882 (9th Cir. 1997) ("[T]he 'United States is the real party in interest in any False Claims Act suit, even when it permits a *qui tam* relator to pursue the action on its behalf.'" (quoting *United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 50 (4th Cir. 1992))); *Kelly*, 9 F.3d at 743 ("The express language of the FCA gives relators the right to bring suit on behalf of the government." (emphasis added)). Nor does the FCA "support a finding that the government and the relators can pursue their interests . . . separately," *Schimmels*, 127 F.3d at 884, such that relators could bring their "own case" without binding the government.  Rather, the United States "is bound by the relator's actions" for purposes of res judicata and collateral estoppel. . . .

*Stoner v. Santa Clara County Office of Educ.*, 502 F.3d 1116, 1126 (9th Cir. 2007) (citations omitted); *cf. United States v. B.F. Goodrich Co.*, 41 F. Supp. 574, 574 (S.D.N.Y. 1941) ("The only plaintiff in an action such as this must be the United States, no matter who brings it on its behalf.").

Recognizing that a FCA relator "is suing to remedy an injury in fact suffered by the United States," *Stevens*, 529 U.S. at 771, the Government's interest in receiving compensation for that injury cannot be diminished or extinguished by the death of the relator prior to the entry of judgment.  The Relators cite to *Semtner v. Medical Consultants, Inc.*, 170 F.R.D. 490 (W.D. Okla. 1997), in which the court ruled that a relator's personal representative could pursue her FCA *qui tam* claims following the relator's death; the continued pursuit of such claims comports with Congress' intent in enacting the FCA's *qui tam* provisions as a mechanism for pursuing the Government's cause of action, while abatement of those claims upon the relator's death would only serve to frustrate that purpose.  *Id.* at 495-96.

This court agrees.

Even if the relator's own stake in a FCA *qui tam* recovery is treated as a claim personal to the relator—apart from the recovery of civil penalties and treble damages for the benefit of the

Government—that claim also survives the relator's death.

Generally, in the absence of an expression of contrary legislative intent, the survival of a federal civil cause of action is a question of federal common law.  *See, e.g.*, *James v. Home Constr. Co. of Mobile*, 621 F.2d 727, 729 (5th Cir. 1980).  Under federal common law,

> The survivability of a cause of action depends on whether the recovery is remedial, an action which compensates an individual for specific harm suffered, or penal, an action which imposes damages upon the defendant for a general wrong to the public.  *United States v. NEC Corp.*, 11 F.3d 136 (11th Cir. 1993) (as amended) (citing *Schreiber v. Sharpless*, 110 U.S. 76, 80, 3 S.Ct. 423, 28 L.Ed. 65 (1884)).

*United States v. Land, Winston County*, 221 F.3d 1194, 1197 (11th Cir. 2000).  In *United States v. NEC Corp.*, 11 F.3d 136 (11th Cir. 1993), the Eleventh Circuit ruled that a civil FCA claim survived the death of the relator:

> It is well-settled that remedial actions survive the death of the plaintiff, while penal actions do not.  *Schreiber v. Sharpless*, 110 U.S. 76, 80, 3 S.Ct. 423, 424, 28 L.Ed. 65 (1884); *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 876 (11th Cir.1986); *James*, 621 F.2d at 730.  In deciding whether a statute is penal or remedial, we must examine three factors: "'(1) whether the purpose of the statute was to redress individual wrongs or more general wrongs to the public; (2) whether recovery under the statute runs to the harmed individual or to the public; and (3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered.'" *Wood*, 643 F.2d at 191 (quoting *Murphy v. Household Fin. Corp.*, 560 F.2d 206, 209 (6th Cir.1977)).
>
> Application of the three-prong test from *Wood* persuades us that the FCA's *qui tam* provisions are remedial, rather than penal.

*Id.* at 137.  The *NEC Corp.* panel based its conclusion at least in part on its view that a *qui tam* relator suffers substantial personal harm, which the *qui tam* provisions are intended to redress:

> We believe that a *qui tam* relator suffers substantial harm and the *qui tam* provisions of the FCA are intended to remedy that harm.  First, a *qui tam* relator can suffer severe emotional strain due to the discovery of his unwilling involvement in fraudulent activity.  Moreover, the actual or potential ramifications

on a relator's employment can be substantial.  As several courts have recognized, *qui tam* relators face the Hobson's choice of "keeping silent about the fraud, and suffering potential liability (and guilty consciences), or reporting the fraud and suffering repercussions, some as extreme as dismissal."

*NEC Corp.*, 11 F.3d at 138; *but see United States v. Northrop Corp.*, 59 F.3d 953, 968 (9th Cir. 1995) ("[T]he private right of recovery created by the *qui tam* provisions of the FCA exists not to compensate the *qui tam* relator, but the *United States*. . . . [ *Q* ]*ui tam* actions exist *only* to vindicate the public interest." (emphasis in original; citation and footnote omitted)).

In *Stevens*, the Court concluded that States cannot be held liable under the FCA because, *inter alia*, "the current version of the FCA imposes damages that are *essentially punitive in nature*, which would be inconsistent with state *qui tam* liability in light of the presumption against imposition of punitive damages on governmental entities."  529 U.S. at 784-85 (citing *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 262-63 (1981)) (emphasis added & footnote omitted).

> Although this Court suggested that damages under an earlier version of the FCA were remedial rather than punitive, see *Bornstein*, 423 U.S., at 315, 96 S.Ct. 523; but see *Smith v. Wade*, 461 U.S. 30, 85, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (Rehnquist, J., dissenting), that version of the statute imposed only double damages and a civil penalty of $2,000 per claim, see 31 U.S.C. § 231 (1976 ed.); the current version, by contrast, generally imposes treble damages and a civil penalty of up to $10,000 per claim, see 31 U.S.C. § 3729(a).  Cf. *Marcus*, 317 U.S., at 550, 63 S.Ct. 379 (noting that double damages in original FCA were not punitive, but suggesting that treble damages, such as those in the antitrust laws, would have been).  "The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers."  *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981).

*Id.* at 785-86 (footnote omitted).[5]  The Court has since reiterated this view.  *See PacifiCare*

---

[5]The FCA was amended by the False Claims Amendments Act of 1986, Pub.L. 99-562, 100 Stat. 3153, to

(continued...)

*Health Systems, Inc. v. Book*,  538 U.S. 401, 405 (2003) (noting that in *Stevens* "we characterized

the treble-damages provision of the False Claims Act, 31 U.S.C. §§ 3729-3733, as 'essentially

punitive in nature'")

On the other hand, *Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119

(2003), observed that "it is important to realize that treble damages have a compensatory side,

serving remedial purposes in addition to punitive objectives."  *Id.* at 130.

> While the tipping point between pay-back and punishment defies general
> formulation, being dependent on the workings of a particular statute and the
> course of particular litigation, the facts about the FCA show that the damages
> multiplier has compensatory traits along with the punitive.
> * * * *
> The most obvious indication that the treble damages ceiling has a remedial place
> under this statute is its *qui tam* feature with its possibility of diverting as much as
> 30 percent of the Government's recovery to a private relator who began the action.
> In *qui tam* cases the rough difference between double and triple damages may well
> serve not to punish, but to quicken the self-interest of some private plaintiff who
> can spot violations and start litigating to compensate the Government, while
> benefiting himself as well.

*Id.* at 130, 131.  The FCA's compensatory aspects were cited to support *Cook County*'s ruling

that municipal corporations remained "persons" within the reach of the FCA's provisions

notwithstanding the enhancement of the FCA's civil remedies by the 1986 amendments and the

general presumption against allowing punitive damage awards against municipalities:

> Thus, although *Stevens* recognized that the FCA's treble damages remedy
> is still "punitive" in that recovery will exceed full compensation in a good many
> cases, the force of this punitive nature in arguing against municipal liability is not
> as robust as if it were a pure penalty in all cases. Treble damages certainly do not

---

[5](...continued)
increase the civil penalty to "not less than $5,000 and not more than $10,000 plus 3 times the amount of damages which
the Government sustains because of the act of that person," and "the costs of a civil action brought to recover any such
penalty or damages." 31 U.S.C.A. § 3729(a) (2003).  The civil penalties were later adjusted upward for inflation pursuant
to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub.L. 101-410, § 5, 104 Stat. 891, note following 28
U.S.C. § 2461.  The penalty is currently $5,500 to $11,000.  28 CFR § 85.3(a)(9) (2007).

equate with classic punitive damages, which leave the jury with open-ended
discretion over the amount . . . .

*Id.* at 131-32.[6]

The Supreme Court's varying expressions concerning the punitive or remedial nature of

FCA civil remedies have been echoed in this Circuit.  *See United States ex rel. Sikkenga v.*

*Regence Bluecross Blueshield of Utah*,  472 F.3d 702, 734 (10th Cir. 2006) (Hartz, J., concurring

in part) (observing that "the False Claims Act is a punitive statute, and civil punitive statutes, like

criminal statutes, are to be construed strictly. . . .  The availability of treble damages, even though

it has 'a compensatory side,' *Cook County*, 538 U.S. at 130, 123 S.Ct. 1239, also has a punitive

character, *see Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 785, 120

S.Ct. 1858, 146 L.Ed.2d 836 (2000)." (citation omitted)).  In cases such as *United States ex rel.*

*Aakhus v. Dyncorp, Inc.*, 136 F.3d 676 (10th Cir. 1998), a personal representative had pursued

the *qui tam* claims of a deceased FCA relator, but the court of appeals has not yet squarely

decided the question of survivability of an FCA relator's *qui tam* claims.[7]

In other contexts, the FCA's civil penalty and treble damages remedies have been held to

require evaluation as "punishment" under the Constitution's Double Jeopardy Clause and the

_____

[6]At least one district court has read *Cook County* to support the conclusion that "a relator's recovery under the
FCA constitutes a remedial action rather than a penal one," and thus survives the relator's death.  *U.S. ex rel. Estate of
Botnick v. Cathedral Healthcare System, Inc.*, 352 F. Supp. 2d 530, 532 (D.N.J. 2005); *cf. United States ex rel. Semtner
v. Medical Consultants, Inc.*, 170 F.R.D. 490, 496 (W.D. Okla. 1997) (concluding that "it is entirely consistent with the
statutory structure and history of the *qui tam* provisions of the FCA for the Court to conclude that the relator's role is
neither penal nor remedial, but derivative of the remedial claims of the government and thereby survives the death of the
relator").

[7]In this case, the United States took no position concerning "whether a FCA cause of action survives a relator's
death."  (Memorandum of United States as Amicus Curiae on Defendant's Motion to Dismiss Roger Lemmon as a
Relator, etc., filed June 3, 2004 (dkt. no. 37), at 2 n.2.)  It did opine that it is "clear that the FCA treble damage plus
penalties remedy is primarily remedial in nature, although it also has deterrent and punitive dimensions."  (*Id.* at 8
(footnote omitted).)  Indeed, "the Court's subsequent decision in *Cook County* indicates that the Court did not intend its
passing remark in *Stevens* to constitute a holding that the FCA is primarily punitive in all contexts.  (*Id.* at 9.)

Excessive Fines Clause.  In *United States v. Halper*, 490 U.S. 435 (1989), the Court held the

FCA's prior civil penalty provisions to be sufficiently punitive to trigger the application of the

Double Jeopardy Clause in the context of that case:

> [A] civil sanction that cannot fairly be said solely to serve a remedial purpose, but
> rather can only be explained as also serving either retributive or deterrent
> purposes, is punishment, as we have come to understand the term. . . .  We
> therefore hold that under the Double Jeopardy Clause a defendant who already has
> been punished in a criminal prosecution may not be subjected to an additional
> civil sanction to the extent that the second sanction may not fairly be characterized
> as remedial, but only as a deterrent or retribution.
> * * * *
> The rule is one of reason: Where a defendant previously has sustained a criminal
> penalty and the civil penalty sought in the subsequent proceeding bears no rational
> relation to the goal of compensating the Government for its loss, but rather
> appears to qualify as "punishment" in the plain meaning of the word, then the
> defendant is entitled to an accounting of the Government's damages and costs to
> determine if the penalty sought in fact constitutes a second punishment.

490 U.S. at 448-49 (citation omitted).

In *United States v. Mackby*, 261 F.3d 821, 830 (9th Cir. 2001), a *qui tam* action, the Ninth

Circuit noted that the language of the FCA does not specify whether the civil penalty of $5,000 to

$10,000 per claim is meant to be punitive or remedial, but that "the sanction clearly has a

punitive purpose," consistent with the Supreme Court's observation in *Stevens* that treble

damages under the FCA, "at least in combination with the Act's civil penalty provision, are

'essentially punitive in nature,' for the purposes of determining state liability in a *qui tam* suit."

261 F.3d at 831 (quoting *Stevens*, 529 U.S. at 784-86).  Because the FCA's civil sanctions are "at

least in part . . . punishment" and its treble damages provision "is not solely remedial," the

*Mackby* court held that both remedies were subject to an Excessive Fines Clause analysis under

the Eight Amendment.  221 F.3d at 830, 831.

-11-

Yet, as another district court has opined,

> That courts consider the FCA damages and penalty provisions to be punitive in nature, at least with respect to the *qui tam* defendant or for purposes of state *qui tam* liability, does not, however, fully resolve the issue before this court. As the Eleventh Circuit acknowledged in *NEC Corp.*, *supra*, "a statute can be remedial as to one party, yet penal as to another." 11 F.3d at 137 n. 1 (citation omitted); *see also U.S. v. Land, Winston County*, *supra*, 221 F.3d at 1197-98.

*United States ex rel. Harrington v. Sisters of Providence in Oregon*, 209 F. Supp. 2d 1085, 1088 (D. Or. 2002). In *Harrington*, the court concluded that an FCA claim did not survive the death of the relator absent allegations of particularized injury to the relator: "Assuming that the *NEC Corp.* analysis survives *Vermont Agency* and that in certain special cases, . . . the *qui tam* provisions of the FCA may properly be characterized as remedial, the claim in the present case contains no allegations of personal or substantial harm to the relator, only harm to the public interest." *Id.* But *Harrington* was decided several months before *Cook County*, in which the Court spoke of "quicken[ing] the self-interest of some private plaintiff who can spot violations and start litigating to compensate the Government, while benefiting himself as well," and pointed out that this financial incentive for *qui tam* relators is the "most obvious indication that the treble damages ceiling has a *remedial* place under this statute," 538 U.S. at 131 (emphasis added).[8]

Another district court has concluded that in light of *Cook County*,

> In consideration of this most recent interpretation of the FCA, as well as legislative history indicating a strong intent on the part of Congress to create incentives for relators such as Botnick to come forward, *see Chandler*, 538 U.S. at 133, 123 S.Ct. 1239 ("because Congress was concerned about pervasive fraud ... [it] enhanced the incentives for relators to bring suit"), the Court must agree that

---

[8] Ten years before *Cook County*, the Eleventh Circuit made essentially the same point in the *NEC* case, 11 F.3d at 139 (noting that the *qui tam* provisions of the FCA "provide incentive to government 'whistleblowers'", encouraging individuals with knowledge of government-related fraud to come forward, helping to relieve the government of expensive investigations and litigation).

-12-

the action is remedial and survives Botnick's death.

*United States ex rel. Estate of Botnick v. Cathedral Healthcare System, Inc.*, 352 F. Supp. 2d

530, 532 (D.N.J. 2005).  As one commentary observes,

> By allowing the *qui tam* action to survive, a court acts in harmony with the Legislature's intent to fight fraud and to lure forward persons with information, endowing in them the authority to take action against the alleged defrauder, with the promise of a generous share of the proceeds as well as assurances of restitution for any harm that might befall on them for stepping forward and blowing the whistle. This fulfills the purpose of the False Claims Act—to create a citizen army of fraud-watchers, protecting the government's and the public's interest.

Joseph E. Hoffer, *Qui Tam: Survival of the Action and Fate of the Proceeds Following the Death*

*of the Relator. For the King and for Himself . . . and His Heirs*, 37 ST. MARY'S L.J. 199, 237

(2005).  This court agrees that "[p]ermitting a relator's claim to survive the death of the relator is

consistent with, and supportive of, the underlying purpose and goals of the FCA,"[9] and concludes

that a FCA relator's claim to his stake in a *qui tam* recovery survives the death of the relator, in

this case, Roger Lemmon. "In such a circumstance, a personal representative of the relator's

estate may proceed with the case."  Claire M. Sylvia, *The False Claims Act: Fraud Against the*

*Government* § 11:93 (2004 & Supp. 2008).

> Just as the pirate leaves a map for his successor to find the hidden treasures the pirate had accumulated in life, a *qui tam* relator's complaint and disclosure statement are the map left for successors or legal representatives to uncover fraud against the Government, and reap the rewards of the relator's discovery.  The Act is a powerful tool that Congress has created to protect the public fisc, deter fraud, and assist the Government in uncovering fraud that has already occurred.  None of these purposes are served by abatement of relator's action upon death; on the contrary, they are furthered by permitting a relator's action to survive death and continue to be pursued by the relator's legal

---

[9]Neil V. Getnick, Lesley Ann Skillen & Richard J. Dircks, *Death Cancels Everything but Truth: Survivability of False Claims Act Qui Tam Claims*, 37 FALSE CLAIMS ACT AND QUI TAM Q. REV. 13 (April 2005).

representatives.

Vickie J. Williams, *Dead Men Telling Tales: a Policy-Based Proposal for Survivability of Qui Tam Actions under the Civil False Claims Act*, 83 Neb. L. Rev. 1073, 1114-15 (2005).

For these reasons, Envirocare's motion to dismiss Roger Lemmon as a Relator in this proceeding should be denied, and Plaintiffs' Renewed Motion for the Substitution of Jolene Lemmon for Relator Roger Lemmon, filed April 14, 2005 (dkt. no. 86), should be granted. Jolene Lemmon shall hereafter be substituted for Roger Lemmon pursuant to Rule 25(a)(1) of the Federal Rules of Civil Procedure.

**Envirocare's Renewed Rule 12(b)(6) Motion to Dismiss**

Envirocare renews its Rule 12(b)(6) challenge to the Relators' allegations that it may be held liable under § 3729(a)(7) of the FCA because it "failed to report certain environmental violations to the government to avoid potential fines and clean-up costs that might have been assessed," insisting that "allegations concerning contingent and speculative potential fines do not state a reverse false claim."  (Envirocare's Renewed Motion to Dismiss Relators' Second Amended Complaint Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, filed December 5, 2005 (dkt. no. 116) ("Def's 12(b)(6) Mot."), at 2.)[10]

---

[10]31 U.S.C.A. § 3729(a)(7) imposes civil liability upon someone who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  As the court of appeals recently explained:

This section was added "to provide that an individual who makes a material misrepresentation to avoid paying money owed the Government would be equally liable under the Act as if he had submitted a false claim to receive money." S. Rep. No. 99-345, at 18, 1986 U.S.C.C.A.N. at 5283.  Section 3729(a)(7) is described as a "reverse false claims" provision "because the financial obligation that is the subject of the fraud flows in the opposite of the usual direction." *United States ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prods., Inc.*, 370 F.Supp.2d 993, 998 (N.D. Cal. 2005). The provision may be enforced either by the Attorney General or by a private *qui tam* relator suing on the government's behalf. 31 U.S.C. § 3730(a), (b)(1).

(continued...)

Under 31 U.S.C. § 3729(a)(7) of the False Claims Act, "Relators are required to allege that [Defendant] had an 'existing legal obligation to pay or transmit money or property to the Government' and that [Defendant] submitted false statements or records to conceal, avoid, or decrease that obligation." *Kennard v. Comstock Resources*, 2004 WL 723249, at *8 (10th Cir.  April 5, 2004).  As a matter of law, potential fines are merely contingent and speculative future liabilities and are not existing "obligations" to pay the government money as required by the statute.

(*Id.* at 2-3.)

The Relators respond that "potential fines and penalties for the submission of false claims are neither speculative nor contingent," given "the *existing obligations* that the defendant owed to the Government . . . to accurately report the environmental contamination and the false certifications the defendant made to the Government to in order to avoid contract offsets and payment of cleanup costs, fines and penalties."  (Plaintiffs' Memorandum in Opposition to Defendant's Renewed Motion to Dismiss Relators' Second Amended Complaint Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, filed December 21, 2005 (dkt. no. 124) ("Pltf's 12(b)(6) Mem."), at [2] (emphasis in original).)

Envirocare had an existing contractual obligation to the Government to dispose of the contaminated waste in accordance with "all relevant and appropriate Federal, State and local regulations" and in accordance with the waste management plan submitted by Envirocare and to maintain adequate records of, and report, any contamination to the Government. . . .

At least where, as here, existing contractual obligations were owed to the Government, potential fines and penalties *for conduct constituting a breach of those obligations* constitute a sufficient "obligation" under § 3729(a)(7).

(Plaintiffs' Consolidated Memorandum in Opposition to Envirocare's 9(b) and 12(b)(6) Motions to Dismiss Relators' First Amended Complaint, filed April 14, 2005 (dkt. no. 84) ("Pltfs'

_____

[10](...continued)
*U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1194-95 (10th Cir. 2006).

Consol. Opp. Mem."), at 24-25 (emphasis in original).)  The Relators point to *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1237-38 (11th Cir. 1999), *United States ex rel. Hunt v. Merck-Medco Managed Care, L.L.P.*, 336 F. Supp. 2d 430, 445 (E.D. Pa. 2004), and *United States v. Oxnard Lemon Co.*, 1992 WL 795477 (E.D. Cal. 1992), as authority for their assertion that potential fines and penalties constitute existing "obligations" within the meaning of § 3729(a)(7).

In *Pemco*, the defendant contractor performed maintenance on C-130 aircraft for the Air Force.  The complaint alleged that Pemco was contractually obligated "upon determining that it possessed excess government property"—in that instance, five new C-130 aircraft wings worth more than $2 million—"to submit an inventory schedule identifying the excess property and to dispose of that property in accordance with the government's instructions."  195 F.3d at 1237. Pemco submitted such an inventory, but mis-identified the wings as older models and offered to purchase them for $1,875, to which the Government agreed.  Pemco subsequently resold two of the wings for nearly $1.5 million, and became the target of a § 3729(a)(7) *qui tam* claim.  The Eleventh Circuit rejected Pemco's argument that it did not have an existing obligation to the Government at the time it submitted the false inventory schedule:

> As alleged in the complaint, Pemco had government property in its possession and a contractual obligation to account for the full value of any excess government property by returning that property or otherwise disposing of it in accordance with the government's instructions.  This legal obligation was a specific, ongoing obligation during the life of the contract and did not begin or end at any point in time.  This is the relevant obligation and submitting the inventory form was just part of fulfilling this pre-existing contractual obligation.

*Id.*  Pemco "had an existing contractual obligation" within the meaning of § 3729(a)(7) "either to return . . . or to purchase . . . the excess government property it possessed."  *Id.*

-16-

"In the case at bar," the Relators submit, Envirocare likewise "had an existing contractual obligation . . . to dispose of the contaminated waste in accordance with 'all relevant and appropriate Federal, State and local regulations" and its waste management plan (Pltfs' Consol. Opp. Mem. at 24); Envirocare's alleged failure to disclose its regulatory violations thus served to "conceal, avoid, or decrease an obligation to pay . . . money to the Government" in the form of as-yet-undetermined fines, penalties, clean-up costs and offsets.  Yet in each particular instance, a fine, penalty, cost award or offset may or may not be imposed, and thus the "obligation" may or may not exist.

In *Merck-Medco*, the court concluded that the defendant owed an "obligation" to the Government within the meaning of § 3729(a)(7) as soon as it incurred a penalty prescribed by the express terms of its contract: "Medco . . . incurs the obligation to pay a penalty when its conduct fall below specific contractual obligations, and when there is a contractual provision specifying that such conduct will incur a penalty."  336 F. Supp. 2d at 445.[11]

> The instant that Medco's conduct falls below that contractually required of it, a penalty slams into place through the operation of the contract, without regard to *when* the penalty must be paid.  Any effort by Medco to cover-up its failure, therefore, are efforts that "conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government," in violation of 31 U.S.C. § 3729(a)(7).

*Id.* (emphasis in original; footnote omitted).

Here, the Relators argue that much the same result should obtain—Envirocare's conduct in handling nuclear and other hazardous waste fell below that required of it under its waste

---

[11]As an example, the court pointed out that Medco's contract imposed a sum certain penalty of $3.50 for each prescription "in excess of 2.5% of the prescriptions received on [a] business day" that were not dispensed to plan participants within five business days.  336 F. Supp. 2d at 445.  Medco was thus penalized on a per occurrence basis for undue delay in providing pharmacy benefits under its contract.

disposal contracts with the Army Corps of Engineers,[12] with potential fines, penalties and clean-up costs to follow as a consequence; thus, "a contractual obligation existed when the contamination occurred" in each of the incidents alleged in the Second Amended Complaint, "even though the amount of the cleanup costs and contract offsets or of the fines and penalties were not determined at the time the wrongful conduct occurred."  (Pltfs' Consol. Opp. Mem. at 25, 27.)  The Relators have not identified any sum-certain contractual penalty that would automatically accrue "through the operation of the contract" upon any of the alleged occurrences enumerated in the Second Amended Complaint.  Some further federal or State administrative agency action would be required.

In *United States ex rel. Sequoia Orange Co. v. Oxnard Lemon Co.*, the relator claimed that the defendant producers conspired together to under-report their lemon shipments to the Lemon Administrative Committee in order to obtain additional shipping quotas to which they were not entitled; to avoid paying statutory forfeitures for shipments of lemons in excess of weekly shipping quotas; and to avoid paying per carton assessments for all of the lemons they actually shipped.  The court ruled that the shipping quotas were beyond the scope of the FCA, but that the statutory forfeitures and administrative assessments were "obligations" within the

---

[12]The Relators assert that "Envirocare had an existing contractual obligation to the Government to dispose of the contaminated waste in accordance with 'all relevant and appropriate Federal, State and local regulations' and in accordance with the waste management plan submitted by Envirocare," and to keep records of and report any contamination incidents to the Government.  (Pltfs' Consol. Opp. Mem. at 24-25.)  They also assert that "Envirocare had an existing contractual obligation to pay any penalties, liabilities or damages":

> Both of the Contracts specifically required Envirocare to reimburse the Government for "any penalties assessed against, all liabilities incurred by, costs incurred by and damages suffered by, the Government' by virtue of Envirocare's breach of any term of the Contracts or any negligent or willful act or omission of Envirocare or its employees in the performance of the Contracts.

(*Id.* at 28.)

meaning of § 3729(a)(7); the agricultural marketing statute "established a fixed amount of damages recoverable by the Government for shipments in excess of quota, a claimed obligation equal to the market value of the overshipped fruit," and the Secretary of Agriculture had set the amount of the per-carton assessment representing each lemon handler's *pro rata* share of the Lemon Administrative Committee's operating expenses for the fiscal year.  *Id.*, 1992 WL 795477, at *8.  By shipping lemons they did not report, the defendants sought to avoid payment of the prescribed forfeitures and assessments in amounts that were calculable based upon the quantity of unreported fruit that they shipped.

Here, in contrast, the Relators have not identified any fixed-amount forfeiture or per-unit monetary assessment measured by the quantities of waste improperly handled by Envirocare in the incidents enumerated in the Second Amended Complaint.  From the facts alleged, it is not plainly apparent that any fine, penalty, cost award or offset would necessarily be imposed upon Envirocare in every instance, and the Relators seem to suggest that Envirocare may now be held liable under § 3729(a)(7) for submitting a false claim concealing a potential "obligation" that may never exist.

Absent an existing asset having value (as in *Pemco*) or a sum-certain or formulaic monetary penalty, fee or assessment incurred on a per-occurrence basis (as in *Medco* and *Oxnard Lemon*), it proves difficult to treat the *potential* fines, penalties, clean-up costs and offsets postulated by the Relators as existing "obligations" within the meaning of § 3729(a)(7) that Envirocare sought to avoid or conceal.  The Relators' argument blurs the distinction between Envirocare's contractual "obligation" to comply with applicable environmental statutes and waste-handling regulations, and an "obligation" to pay or transfer money to the United States

within the meaning of § 3729(a)(7).  (*See* Pltfs' 12(b)(6) Mem. at [2].)[13]  The two concepts are

related, but they are not identical or interchangeable.  Breach of the one may lead to imposition

of the other, but the Relators have not averred that such has in fact occurred in this case.

Unless and until it does occur, the *potential* fines, penalties, clean-up costs or offsets now

asserted by the Relators in this context do not constitute "obligations" within the meaning of §

3729(a)(7) of the False Claims Act.[14]  *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d

---

[13]While *Pickens v. Kanawha River Towing*, 916 F. Supp. 702, 708 (S.D. Ohio 1996), lends some support to the Relators' argument, the Sixth Circuit rejected *Pickens*' approach in *American Textile Mfrs. Institute, Inc. v. The Limited, Inc.*, 190 F.3d 729 (6th Cir. 1999), *cert. denied*, 529 U.S. 1054 (2000):

> To recover under the False Claims Act, we believe that the United States must demonstrate that it was owed a specific, legal obligation at the time that the alleged false record or statement was made, used, or caused to be made or used.  The obligation cannot be merely a potential liability: instead, in order to be subject to the penalties of the False Claims Act, a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness. The duty, in other words, must have been an obligation in the nature of those that gave rise to actions of debt at common law for money or things owed.

*Id.* at 735; *see also United States ex rel. Huangyan Import & Export Corp. v. Nature's Farm Products, Inc.*, 370 F. Supp. 2d 993, 1000 (N.D. Cal. 2005) ("This court agrees with the Eighth Circuit (and . . . the Fifth and Sixth Circuits . . .) that potential obligations–fines, penalties and the like–that are contingent upon the exercise of some discretion or intervening act by the government are not properly the subject of a suit under the FCA.")

Moreover, *Pickens* required more than the failure to report an environmental infraction to show the making of a false claim:

> We agree that a reverse false claim requires more than a mere failure to report a violation of another statute.  The language of § 3729(a)(7) creates liability for one who "makes, uses, or causes to be made or used, a false record or statement."  This mandates that the defendant prepare, create or submit some type of statement or record that is false. A failure to report does not count as a statement or record.

*Pickens*, 916 F. Supp. at 708.  Envirocare contends that the Relators have not pleaded its submission of a false statement or record with the requisite specificity under Rule 9(b).

[14]In *American Textile*, the Sixth Circuit explained that § 3729(a)(7) requires

> proof that the defendant made a false record or statement at a time that the defendant owed to the government an obligation sufficiently certain to give rise to an action of debt at common law. Whatever its scope, the False Claims Act clearly encompasses specific and legal duties to pay or transmit money or property to the government. A defendant risks liability when making a false statement to conceal, avoid or decrease obligations such as his prior acknowledgment of indebtedness, a final court or administrative judgment that the defendant owes money or property to the government, or a contractual duty to pay or transmit money or property to the government.

190 F.3d at 736.  In doing so, the panel followed the reasoning of the Eighth Circuit in *United States v. Q International*

(continued...)

-20-

1189 (10th Cir. 2006), *cert. denied*, 128 S. Ct. 388 (2007),[15] supports this conclusion.  In

*Conagra*, the Tenth Circuit adopted the view that the fact that particular conduct "might result in

a fine or a penalty is insufficient to establish a § 3729(a)(7) obligation."  *Id.* at 1195.

> There are two primary reasons why potential fines and penalties are not §
> 3729(a)(7) obligations.  First, to apply the statute in that context would unduly
> broaden it. . . .  Second, the discretion vested in prosecutors and other government
> officials to determine whether to seek fines or penalties renders the alleged
> "obligation" contingent and thus beyond the reach of the statute. . . .

*Id.* at 1196 (citations omitted).  The *Conagra* panel cited several cases as authority, including

those relied upon by Envirocare.[16]  It distinguished *Pemco* as involving "'a contractual obligation

to account for the full value of any excess government property'" then in the contractor's

possession, "in which a party is required to pay money to the government, but, at the time the

obligation arises, the sum has not been precisely determined."  *Id.*  at 1197, 1201 (quoting

---

[14](...continued)
*Courier, Inc.*, 131 F.3d 770 (8th Cir. 1997).

[15]*Conagra* was decided on October 12, 2006, some months subsequent to the February 17, 2006 hearing.
Neither side in this case has briefed or argued the import of the Tenth Circuit's opinion, or requested an opportunity to do
so.  Nor did any party submit *Conagra* as a citation of supplemental authority.  *See* DUCivR 7-1(b)(5).  Nonetheless,
*Conagra* proves to be instructive—perhaps even decisive—of the "obligation" question raised by Envirocare's Rule
12(b)(6) motion.

[16]*Conagra* cites the following cases:

*United States ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 657 (5th Cir. 2004) (stating that §
3729(a)(7) "does not extend to the potential or contingent obligations to pay the government fines or
penalties which have not been levied or assessed (and as to which no formal proceedings to do so have
been instituted) and which do not arise out of an economic relationship between the government and
the defendant (such as a lease or a contract or the like)"); *Am. Textile Mfrs.*, 190 F.3d at 738 (stating
that § 3729(a)(7) does not apply to "contingent obligations[,] includ[ing] those arising from civil and
criminal penalties that impose monetary fines after a finding of wrongdoing: as opposed to
quasi-contractual obligations created by statute or regulation" and those that "attach only after the
exercise of administrative or prosecutorial discretion, and often after a selection from a range of
penalties"); *Q Int'l*, 131 F.3d at 773 (stating that § 3729(a)(7) does not apply to "attempts to avoid
potential fines or sanctions"); *Huangyan Imp. & Exp.*, 370 F.Supp.2d at 1000 (stating that "potential
obligations--fines, penalties and the like–that are contingent upon the exercise of some discretion or
intervening act by the government are not properly the subject of a suit under [§ 3729(a)(7)]").

465 F.3d at 1195-96.

*Pemco*, 195 F.3d at 1237);  "These decisions establish a dichotomy between 'existing debts,' which are covered by the statute, and 'contingent penalties,' which are not."  *Id.* (citing *Huangyan Imp. & Exp.*, 370 F. Supp. 2d at 1000).

In *Conagra*, the USDA required exporters of meat products and animal hides to obtain "in lieu of" or replacement export certificates when their existing export certificates required "significant" or "major" changes, accompanied by the payment of a prescribed fee.  These fees for "in lieu of" and replacement export certificates "are best characterized as user fees; they are not penalties.  The fees must be paid in limited circumstances, and they are thus distinguishable from the general obligation to comply with statutes and regulations outside the scope of § 3729(a)(7)."  *Id.* at 1203.

> Here, evidence submitted by both Mr. Bahrani and Conagra indicates that when export certificates required "significant" or "major" changes, the USDA required exporters to obtain "in lieu of" or replacement certificates. It was at that point–when the changes became necessary–that the obligation arose.  The fact that USDA officials may have some subsequent discretion whether to actually charge the authorized fee does not mean that the "obligation" is a contingent one outside the scope of § 3729(a)(7).

*Id.* at 1204.

The Relators do not argue that Envirocare incurred any prescribed fee or a fixed or formulaic assessment per occurrence concerning the incidents of improper waste handling alleged in the Second Amended Complaint, similar to the fees for replacement certificates incurred in *Conagra*.  Instead, they insist that those alleged incidents *may* subject Envirocare to liability for fines, penalties, clean-up costs *or* offsets—all of them yet to be determined, and none of them prescribed on a sum-certain or formulaic per-occurrence basis by Envirocare's government contracts, or by the applicable statutes and regulations.

-22-

For the reasons explained above, amplified by the Tenth Circuit's ruling in *Conagra*,

Envirocare's Rule 12(b)(6) motion should be granted.

**Envirocare's Renewed Rule 9(b) Motion to Dismiss**

As the court of appeals recently explained:

> Rule 9(b) states that "in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). . . . "At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where and how' of the alleged fraud." *Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997), and must "set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch*, 203 F.3d at 1236.

*United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*,  472 F.3d 702, 726-27

(10th Cir. 2006); *accord*, *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir.

1997); *Lawrence Nat'l Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176, 180 (10th Cir. 1991);

*Caprin v. Simon Transp. Services*, 112 F. Supp. 2d 1251, 1255 (D. Utah 2000) ("As interpreted,

the rule requires a plaintiff to identify the time, place, and content of each allegedly fraudulent

representation or omission, to identify the particular defendant responsible for it, and to identify

the consequences thereof."); *Karacand v. Edwards*, 53 F. Supp. 2d 1236, 1241 (D. Utah 1999)

(same).   "The purpose of Rule 9(b) is to prevent the filing of a complaint as a pretext for the

discovery of unknown wrongs," *In re Silicon Graphics, Inc. Securities Litigation*, 970 F. Supp.

746, 752 (N.D. Cal. 1997), and "'to afford defendant fair notice of plaintiff's claim and the

factual ground upon which it is based.'" *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d

982, 987 (10th Cir. 1992) (quoting *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990)).  Indeed,

> Perhaps the most basic consideration for a federal court in making a judgment as to the sufficiency of a pleading for purposes of Rule 9(b)—a consideration that is reflected in many of the decided cases—is the determination of how much detail

-23-

> is necessary to give adequate notice to an adverse party and enable that party to
> prepare a responsive pleading.

5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1298, at 236 (3d
ed. 2004) (footnote omitted).

Thus, a fraud claim is subject to Rule 9(b)'s heightened pleading standard in order to
protect defendants from spurious charges and to put defendants on notice of the "precise
misconduct with which they are charged." *Ziemba v. Cascade Intern. Inc.*, 256 F.3d 1194, 1202
(11th Cir. 2001).

As the Relators correctly point out, "[t]he dismissal of a complaint or counterclaim for
failing to satisfy the requirements of Rule 9(b) is treated as a dismissal for failure to state a claim
upon which relief can be granted under Fed. Rules Civ. P. 12(b)(6)." *Seattle-First Nat. Bank v.
Carlstedt*, 800 F.2d 1008, 1011 (10th Cir. 1986) (citing *Benoay v. Decker*, 517 F. Supp. 490, 494
(E.D. Mich. 1981), *aff'd without opinion*, 735 F.2d 1363 (6th Cir. 1984)).  Thus, in reviewing a
complaint under Rule 9(b), the court accepts as true all well-pleaded facts, as distinguished from
conclusory allegations, and views those facts in the light most favorable to the non-moving party.
*See Regence Bluecross*, 472 F.3d at 726; *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 & n.5
(10th Cir. 1997); *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts
"are not bound to accept as true a legal conclusion couched as a factual allegation").

"[E]very circuit court that has addressed this issue has concluded that the heightened
pleading requirements of Rule 9(b) apply to claims brought under the FCA," *United States ex rel.
Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 228 (1st Cir. 2004), including the Tenth
Circuit.  *See Regence Bluecross*, 472 F.3d at 726 (stating that Rule 9(b)'s "heightened pleading

requirements apply to actions under the FCA").[17]

"[T]he defendant's presentation of false or fraudulent claims to the government is a central element of every False Claims Act case," *Karvelas*, 360 F.3d at 232, and must be pleaded with Rule 9(b) particularity:

> Rule 9(b)'s directive that "the circumstances constituting fraud and mistake shall be stated with particularity" does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payment must have been submitted, were likely submitted or should have been submitted to the Government.

*United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002).

Envirocare argues that once again, the relators have failed to plead FCA claims in the Second Amended Complaint with particularity sufficient to satisfy Rule 9(b).[18]  In particular, Envirocare contends that the Relators (1) "still fail to plead with specificity 'who' falsified or

---

[17]*See United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1308-09 (11th Cir. 2002) (holding that Rule 9(b) applies to *qui tam* actions under the FCA); *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001) (same); *United States ex rel. Russell v. Epic Healthcare Mgmt. Group*, 193 F.3d 304, 308 (5th Cir. 1999) (same); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783-84 (4th Cir. 1999) (same); *United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 234 (3d Cir. 1998) (same); *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476-77 (2d Cir. 1995) (same, collecting cases); see also John T. Boese, *Civil False Claims and Qui Tam Actions* § 5.04 (2d ed. 2000 & Supp. 2003) ("It is widely accepted by courts that because the essence of a False Claims Act is fraud, Rule 9(b) applies to FCA cases.... The applicability of Rule 9(b) to *qui tam* actions is by now beyond dispute.").

[18]According to Envirocare,

> The pleading is deficient. It fails for the same reason that its two predecessors failed: it tries to substitute generalizations and assumptions for the particularity in fact pleading that is demanded in a fraud case. Relators try to shift the focus away from their continued inability to satisfy Rule 9(b) by arguing that they are unfairly being required to possess "perfect and absolute knowledge of the facts" surrounding their allegations. . . .  That argument is a red herring. Neither Rule 9(b), nor this Court in dismissing relators' prior defective pleadings, has made such a demand upon relators. What Rule 9(b) demands is that relators, before leveling serious charges, possess enough knowledge about the allegations to enable them to plead the substance of the allegations "with particularity." Relators have never been able to do this.

(Reply Memorandum in Support of Defendant's Motion to Dismiss Pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, filed January 20, 2006 (dkt. no. 129) ("Def's 9(b) Reply"), at iv (record citation omitted).)

submitted the allegedly false compliance reports" and false invoices upon which their FCA claims rely; (2) they "still fail to plead with specificity 'when'" those false compliance reports and invoices were submitted; (3) "they still fail to plead with specificity a plausible theory as to 'how' Envirocare's alleged mistakes on a private contract with the W.R. Grace Company could constitute fraud against the United States Government," or cause a loss to the federal treasury; (4) they fail to plead the essential element of materiality with the specificity required by Rule 9(b); and (5) they fail to specify the "submission to the federal government of an invoice containing false statements," or other false claims that were actually presented by Envirocare to the Government.  (Memorandum in Support Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint Pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, filed December 5, 2005 (dkt. no. 118) ("Def's 9(b) Mem."), at 1, 14.)  Even more fundamentally, Envirocare argues that the Relators have no underlying factual footing for their pleaded allegations that Envirocare failed to report the alleged regulatory violations to the Government; that Envirocare submitted false certifications of its regulatory compliance; or that the Government did not already take those incidents into account in deciding to disburse payments to Envirocare under the terms of its government contracts. (*Id.* at 2-3, 6-7.)

Recalling that under Rule 9(b) in this Circuit, "a plaintiff alleging fraud must know what his claim is when he files it" and "should seek to redress a wrong, not to find one," *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d at 990, Envirocare submits that in the Second Amended Complaint, "[i]t is obvious that relators have pled *not* on the basis of what they know to be true, but rather on the basis of what they *hope* might turn out to be true.  This is precisely the approach that Rule 9(b) forbids."  (Def's 9(b) Mem. at 4 (emphasis in original).)

The Relators respond that the Second Amended Complaint does plead the "who", "what", "when", "where" and "how" of Envirocare's allegedly false claims with sufficient particularity to put Envirocare on fair notice of each of the instances in question, and that under Rule 9(b) they need do no more than that.  (Plaintiffs' Response to Defendant's Motion to Dismiss 2nd Amended Complaint Pursuant to Rule 9(b), filed December 19, 2005 (dkt. no. 122) ("Pltfs' 9(b) Mem."), at [3]-[7]); *cf. Burch ex rel. United States v. Piqua Engineering, Inc.*, 145 F.R.D. 452, 455 (S.D. Ohio 1992) (stating that "the pleading must place the defendant on notice of the specific misconduct or fraudulent acts of which the plaintiff complains.")  They invite the court to presume the materiality of the alleged omissions and misrepresentations,[19] and argue that the factual particulars as to the reports,  payment requests and certifications referred to in their pleading remain within Envirocare's knowledge and control, in company records to which the Relators have not yet gained access.  (*Id.* at 2, 12-13); *cf. Pickens v. Kanawha River Towing*, 916 F. Supp. 702, 706 (S.D. Ohio 1996) ("Rule 9(b) has an exception when the relevant information is in the exclusive possession of the opposing party." (citing *Wilkins ex rel. United States v. State of Ohio*, 885 F.Supp. 1055, 1061 (S.D. Ohio 1995) (holding that a relator's failure to meet the particularity requirements of Rule 9(b) did not bar his claim where the relator was a former employee of the defendants and lacked access to records and documents in the possession of the defendants that contained information necessary to plead with particularity))); *United States ex rel. Kozhukh v. Constellation Tech. Corp.*, 64 F. Supp. 2d 1239 (M.D. Fla. 1999).  The Relators insist that "when plaintiffs' counsel discloses that plaintiffs are unaware of whether Envirocare

---

[19](*See id.* at [8] (contending that "allegations of serious violations of contracts concerning the disposal of radio-active [sic] and highly toxic wastes must, at this stage[,] be *presumed* material" (emphasis in original)).)

reported the many contract violations alleged to the government," they should nonetheless avoid dismissal and "be able, through discovery, to hear directly from Envirocare whether disclosures of contract violations were made and how, if at all, the government responded to those disclosures."  (*Id.* at [7], [8].)

Having reviewed the entire 863 paragraphs of the Second Amended Complaint—and its annexed exhibits—with some care, the court is satisfied at this point that the pleading meets Rule 9(b)'s requirements as to the "who", "when", and "where"of the Relators' FCA *qui tam* claims. *See United States ex rel. Yannacopolous v. General Dynamics*, 315 F. Supp. 2d 939, 945 (N.D. Ill. 2004); *United States ex rel. Downy v. Corning, Inc.*, 118 F. Supp. 2d 1160 (D.N.M. 2000).  It details each alleged regulatory infraction with sufficient detail to identify the particular incident, giving fair notice to Envirocare of each alleged occurrence.

Still lacking in many instances is a clear identification of the waste material to a particular federal contract and to a clearly "federal" source.  In particular, ambiguity persists as to whether references to "W.R. Grace" waste involve federally or privately contracted disposal.

The Relators argue that their current pleading also articulates their theory as to "how" false claims may have been submitted to the Government: "in every claim for relief plaintiffs affirmatively allege that Envirocare failed to disclose significant contract violations and that the government subsequently paid Envirocare in reliance on Envirocare's false certifications," (Pltfs' 9(b) Mem. at [8]); they also allege "that Envirocare, by submitting requests for payment under the contracts, must necessarily be held to having certified, by virtue of the payment request, that it is in compliance with the contract."  (*Id.* at [10].)

The Relators' sixty-seven claims for relief repeat nearly identical boilerplate allegations

-28-

as to "how" Envirocare submitted false claims to the Government:

62.   In addition, Envirocare, through its Revenue Accountants, Leigh Barrington, Jorden Redford and others submitted [] Payment Estimates or invoices to the Government for payment of money covering the period that included [specific violation date]. (See, e.g., Exhibits E and F.  Relators have been unable to obtain specific invoices for this period.)  Based on the failure to report the spill of contaminated material by Envirocare, this request(s) for payment to the U.S. Government constituted a false claim(s) whether or not Envirocare's Revenue Accountants were expressly aware of the spill.

63.   The Relators allege that Envirocare knowingly made this false statement(s) and certification(s) in order to obtain payment pursuant to the Contracts and/or to conceal, avoid or decrease its obligation to pay penalties or other costs associated with disposing of waste in violation of applicable laws, permits, licenses and requirements, in violation of 31 U.S.C. § 3729 et seq.

64.   The Relators allege that all Pay Estimate(s) or invoice(s) that cover the violation date in this cause of action were subsequently paid in full by the United States Government to Envirocare.

65.   The Relators allege that the U.S. Government, unaware of the falsity of the claims and/or statements, and in reliance on the accuracy thereof, paid Envirocare for disposal of waste pursuant to the Contracts and was damaged to the extent that these funds would not otherwise have been paid.

66.   The Relators allege that the U.S. Government and/or its agent, the State of Utah, unaware of the falsity of Defendant's claims and/or statements, and in reliance on the accuracy thereof, and unaware of Envirocare's failure to report the violation set forth herein, failed to impose civil fines and/or penalties upon Enviorcare or collect the same therefrom, and was damaged to the extent that such fines and/or penalties would otherwise have been obtained from Envirocare.

(Second Amended Complaint at 18 ¶¶ 62-66; *see id.* at 20-21 ¶¶ 76-80; *id.* at 23 ¶¶ 94-98; *id.* at 25-26 ¶¶ 110-13; *id.* at 27-28 ¶¶ 125-28; *id.* at 30 ¶¶ 140-43; *id.* at 32 ¶¶ 156-59; *id.* at 34 ¶¶ 170-73; 36-37 ¶¶ 186-90; *id.* at 38-39 ¶¶ 202-06; *id.* at 41 ¶¶ 220-23; *id.* at 43-44 ¶¶ 236-39; *id.* at 46 ¶¶ 253-56; *id.* at 48-49 ¶¶ 267-71; *id.* at 51-52 ¶¶ 285-89; *id.* at 54-55 ¶¶ 301-05; *id.* at 57-58 ¶¶

318-22; *id.* at 61 ¶¶ 336-40; *id.* at 64-65 ¶¶ 354-58; *id.* at 67-68 ¶¶ 371-75; *id.* at 70-71 ¶¶ 388-92; *id.* at 73-74 ¶¶ 406-09; *id.* at 76-77 ¶¶ 423-26; *id.* at 79-80 ¶¶ 439-43; *id.* at 83 ¶¶ 456-59; *id.* at 86 ¶¶ 474-77; *id.* at 88-89 ¶¶ 491-95; *id.* at 91 ¶¶ 508-12; *id.* at 93-94 ¶¶ 527-30; *id.* at 96-97 ¶¶ 546-49; *id.* at 104-05 ¶¶ 582-86; *id.* at 106-07 ¶¶ 597-601; *id.* at 108-09 ¶¶ 613-17; *id.* at 111 ¶¶ 629-32; *id.* at 113 ¶¶ 645-48;  *id.* at 115-16 ¶¶ 660-63; *id.* at 117-18 ¶¶ 675-78; *id.* at 119-20 ¶¶ 690-93; *id.* at 121-22 ¶¶ 705-08; *id.* at 123-24 ¶¶ 719-22; *id.* at 125-26 ¶¶ 733-36; *id.* at 128 ¶¶ 746-49; *id.* at 130 ¶¶759-62; *id.* at 132 ¶¶772-75; *id.* at 134 ¶¶ 774-78; *id.* at 136 ¶ 789-92; *id.* at 138-39 ¶¶ 801-05; *id.* at 141-42 ¶¶ 814-18; *id.* at 144 ¶¶ 827-31; *id.* at 146-47 ¶¶ 839-43; and *id.* at 148-49 ¶¶ 853-57.)

The Relators' counsel acknowledge that "they have not obtained a separate pay request for every claim in the 2nd Amended Complaint." (Pltfs' 9(b) Mem. at [12].) As to twenty-seven claims, the Relators identify *one* payment request that covers the time period in which the alleged incident occurred—pleading that "Envirocare, through its Revenue Accountant, Leigh Barrington submitted a 'Payment Estimate–Contract Performance' form dated October 6, 2000 to the Government for payment of $111,151.16, *as well as other payment estimates or invoices covering the period that included*" the date of the alleged regulatory violation, (Second Amended Complaint at 25 ¶ 109 (emphasis added)), or referencing a similar form "dated December 8, 2000 . . . for payment of $383,888.81." (*Id.* at 29 ¶ 139; *see also id.* at ¶¶ 124, 155, 219, 235, 252, 405, 422, 455, 473, 526, 545, 562, 628, 644, 659, 674, 689, 704, 718, 732, 745, 758, 771, 774, 788.) In one instance, the Relators identify a series of specific payment requests submitted during the Spring of 2001 that purportedly bear upon Envirocare's spill of contaminated sand along a fence line during that season. (*Id.* at 34 ¶ 169.)

Yet in *every* instance, the Relators' pleading does *not* identify the particular "what" of each claim for relief, *viz.*, the specific contract compliance *certifications* that they allege to be false.  Counsel for the Relators argue that allegations as to *method* should suffice:

> Plaintiffs have no doubt that complete documentation regarding the payment process exists.  For now, plaintiffs have demonstrated *the method through which payments are requested, certified, and submitted* by Envirocare to the Government.  Plaintiffs are quite confident that the process and relevant documentation thereof was consistent throughout the period relevant to the 2nd Amended Complaint.  Plaintiffs contend that such a showing, particularly where relevant information and documentation is extremely difficult to obtain, should be sufficient to survive a challenge under Rule 9(b).

(Pltfs' 9(b) Mem. at [12] (emphasis added).)  But Envirocare's memoranda[20] effectively refute the relevance of the certifications found in exhibits to the Second Amended Complaint, and Relators' counsel concede that the additional sample "Contractor's Request for Payment Certification," annexed as Exhibit "A" to the Relators' memorandum, is "not claimed to be directly associated with any of the violations alleged in the [Second Amended] Complaint."  (*Id.* at [7] n.2.)  The Relators assert that they "are confident that this is another standard form document in the billing process and that *we will find similar express certifications* in connection with the Requests for Payment during the relevant time period."  (*Id.* at [11] (emphasis added).)

The Relators repeat similar boilerplate allegations concerning Envirocare's omission of each alleged incident from the routine quarterly or annual reports submitted by Envirocare, usually to the State of Utah:

> 41.   Pursuant to the requirements set forth in paragraph 31, above, Envirocare submitted a BAT Quarterly Report to the U.S. Government's agent, the State of Utah, for the time period including July 14, 2000.  In that Report, Envirocare knowingly failed to report the spill that occurred on or around

---

[20](*See* Def's 9(b) Mem. at 15-20; Pltfs' 9(b) Mem. at [6]-[7], [10]-[11]; Def's 9(b) Reply at 11-12.)

> July 14, 2000, and was reported by Relator Lemmon on that date.  In so
> doing, Envirocare knowingly made a false statement and certification to
> the U.S. Government that it had met the BAT requirements imposed by the
> federal Clean Water Act, as implemented by the Utah Water Quality Act
> and UGW 450005.

(Second Amended Complaint at 17-18 ¶ 41; *see id.* at ¶¶ 75, 93, 108, 123, 138, 154, 168, 185,

201, 218, 234, 251, 266, 283, 299, 316, 334, 352, 852; *see also id.* at 369-70 ( "BAT Quarterly

Report" and "annual 'As-Built' Report), 386-87 (same), 403-04 (same), 420-21 (same); 437-38

(same), 453-54 (same), 471-72 (same), 489-90 (same), 506-07 (same), 524-25 (same), 543-44

(same), 560-61 (same), 580-81 (same), 702-03 (same); *id.* at 716 ("annual 'As-Built' Report"),

731 (same), 744 (same), 757 (same), 770 (same), 773 (same), 787 (same).)   As to some

incidents, the Relators point to *no* report having been submitted at all, but nevertheless allege that

"Envirocare knowingly made these false statements and certifications in order to obtain

payment" under its government contracts.  (*See id.* at 106 ¶¶ 595-96 (alleging that "Envirocare

was required to report this violation to the U.S. Government," but "that Envirocare failed to

report to the U.S. Government" the fact that the alleged violation occurred); *id.* at ¶¶ 611-12

(same), 626-27 (same), 642-43 (same), 657-58 (same), 672-73 (same), 799-800 (same), 812-13

(same), 825-26 (same), 837-38 (same).)

But having expressly acknowledged that they "are unaware of whether Envirocare

reported the many contract violations alleged to the government," (Pltfs' 9(b) Mem. at [7]), how

do the Relators justify an inference that any such certifications given by Envirocare were actually

false?

> What is absolutely true . . . is that *plaintiffs have seen no evidence, or any*
> *indication that evidence exists, of Envirocare having reported any of the specific*
> *contract violations* alleged in the [Second Amended] Complaint. Consequently,

> plaintiffs affirmatively allege that Envirocare violated specific provisions of its
> contracts with the government and failed to remediate or report the violations.

(*Id.* (emphasis added).)  At the same time, the Relators insist that they "have no access to records

of the defendant," that the relevant payment documentation remains in Envirocare's control, and

that they have had to rely "on what could be obtained through a time-consuming, burdensome

and reliable FOIA process."  (*Id.* at [2].)  And the Relators seem to concede that they cannot now

identify any specific payment request certification that was false, and that they must await

discovery to "hear directly from Envirocare whether disclosures of contract violations were made

. . . ."  (*Id.* at [8].)[21]

Envirocare replies that the Relators' failure to identify any particular false certifications in

the Second Amended Complaint must prove fatal to their pleading under Rule 9(b), given their

acknowledged lack of direct evidentiary proof that false certifications were actually made by

Envirocare concerning the incidents in question.  Envirocare posits that more is at issue under

Rule 9(b) than fair notice to a defendant of a Relator's *qui tam* allegations:

> Under Rule 9(b), a relator may not plead his case and only then seek to
> ascertain, through discovery, whether there is anything to the charge of fraud.  The
> Tenth Circuit has warned against allowing a relator to use discovery to attempt to
> uncover the facts that he was supposed to have in hand before filing the
> complaint.  Yet that is precisely what the relators admit they have done.

(Def's 9(b) Mem. at 4-5).  "The question . . . is not whether relators think that fraud was

committed, nor whether they think that there must be, somewhere, documents that constitute

helpful evidence.  The question is whether the pleading comports with Rule 9(b)," which

---

[21]By itself, the fact that the Relators have not *seen* the contents of documents and certifications to which they
concededly have had little or no access does not lend much force to their inference that in every instance, those
documents falsely certify contractual compliance.  *Cf. Kowal v. MCI Comm'n Corp.*, 16 F.3d 1271, 1276 (D.C. Cir.
1994) (stating that "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the
facts set out in the complaint").

"forbids the filing of a complaint as 'a pretext for the discovery of unknown wrongs.'" (Def's

9(b) Reply at iii, 1 (quoting *Caprin*, 112 F. Supp. 2d at 1255).)

> Even outside of the Rule 9(b) context, it would be improper to file suit
> where the bedrock allegation is admittedly rank speculation and where the pleader
> says that it 'hopes' to find out what really happened through discovery. . . . But in
> a Rule 9(b) context, such conduct is unthinkable.  There is no room in Rule 9(b)
> for the 'guess, accuse, and hope for the best' technique that relators have
> employed. . . .

(*Id.* at 2 (citations omitted).)

Courts have approached any relaxation of Rule 9(b)'s requirements with caution:

> Although some courts have recognized in theory that the particularity
> requirements of Rule 9(b) may be relaxed in an FCA *qui tam* action where the
> information relevant to the fraud is "'peculiarly within the perpetrator's
> knowledge,'" *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 330 (5th
> Cir. 2003) (quoting *Russell*, 193 F.3d at 308), few courts have actually applied a
> relaxed Rule 9(b) standard to an FCA *qui tam* action. *See* Boese, *Civil False
> Claims and Qui Tam Actions*, § 5.04[D] (noting that "[r]arely some courts will
> grant *qui tam* relators 'additional leeway' under Rule 9(b) when information is
> exclusively in the hands of the defendant").

*Karvelas*, 360 F.3d at 229 (footnote omitted).  Some courts have refused to allow FCA *qui tam*

relators to rely on later discovery to comply with Rule 9(b)'s pleading requirements. *See, e.g.*,

*Clausen*, 290 F.3d at 1313 n.24 (noting that allowing a plaintiff "to learn the complaint's bare

essentials through discovery . . . may needlessly harm a defendant['s] goodwill and reputation by

bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, [contains]

baseless allegations used to extract settlements"); *Russell*, 193 F.3d at 308 (holding that "a

special relaxing of Rule 9(b) is a *qui tam* plaintiff's ticket to the discovery process that the statute

itself does not contemplate").

The reluctance of courts to permit *qui tam* relators to use discovery to meet the
requirements of Rule 9(b) reflects, in part, a concern that a *qui tam* plaintiff, who

has suffered no injury in fact, may be particularly likely to file suit as "a pretext to
uncover unknown wrongs." *United States ex rel. Robinson v. Northrop Corp.*, 149
F.R.D. 142 (N.D. Ill. 1993) (noting Rule 9(b)'s discouragement of pre-textual
claims in rejecting special 9(b) treatment of a *qui tam* plaintiff).

*Karvelas*, 360 F.3d at 231 (footnote omitted).

Envirocare's reading of Rule 9(b) seems to be strongly infused with Rule 11 principles,

particularly Rule 11(b)(3)'s expectation that "the factual contentions have evidentiary support."[22]

Earlier versions of the Rule spoke of pleadings "well grounded in fact."

Yet Rule 11(b)(3) makes allowance for cases in which specific facts essential to a claim

may need to be identified through discovery.  By signing a pleading, counsel certifies that "that to

the best of the person's knowledge, information, and belief, formed after an inquiry reasonable

under the circumstances: . . . (3) the factual contentions have evidentiary support or, if

specifically so identified, will likely have evidentiary support after a reasonable opportunity for

further investigation or discovery; . . . ."  As the Advisory Committee Note to the 1993

Amendments to Rule 11(b) explains,

> The certification with respect to allegations and other factual contentions
> is revised in recognition that sometimes a litigant may have good reason to believe
> that a fact is true or false but may need discovery, formal or informal, from
> opposing parties or third persons to gather and confirm the evidentiary basis for
> the allegation.  Tolerance of factual contentions in initial pleadings by plaintiffs or
> defendants when specifically identified as made on information and belief does
> not relieve litigants from the obligation to conduct an appropriate investigation
> into the facts that is reasonable under the circumstances; it is not a license to join
> parties, make claims, or present defenses without any factual basis or justification.
> Moreover, if evidentiary support is not obtained after a reasonable opportunity for
> further investigation or discovery, the party has a duty under the rule not to persist

---

[22]Indeed, Envirocare alludes to Rule 11 in its memorandum: "What is less clear is *the basis upon which relators'
counsel could sign and file the pleading* under these circumstances.  How can a party allege fraud where a party has
already admitted that, for all it knows, the heart of the alleged fraud did not even happen?" (Def's 9(b) Mem. at 5
(emphasis added).)

with that contention.  Subdivision (b) does not require a formal amendment to pleadings for which evidentiary support is not obtained, but rather calls upon a litigant not thereafter to advocate such claims or defenses.

The certification is that there is (or likely will be) "evidentiary support" for the allegation, not that the party will prevail with respect to its contention regarding the fact. . . .

Whatever Rule 9(b) may fairly be read to require in terms of a genuine factual footing, it logically cannot be more stringent or exacting than Rule 11(b)(3)'s explicit standard for the pleading of factual allegations.

Nor may the Rule 9(b) standard ignore Rule 8(a)(2)'s "short and plain statement" requirement, or the overall policy of the Federal Rules favoring notice pleading.  As one noted commentary suggests,

> [I]t is inappropriate to focus exclusively on the fact that Rule 9(b) requires particularity in pleading the circumstances of fraud.  This is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the federal rules and the many cases construing them; in a sense, therefore, the rule regarding the pleading of fraud does not require absolute particularity or a recital of the evidence, especially when some matters are beyond the knowledge of the pleader and can only be developed through discovery.

5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1298, at 192 (3d ed. 2004) (footnotes omitted).  "The requirements of Rule 9(b) must be read in conjunction with the principles of Rule 8, which calls for pleadings to be 'simple, concise, and direct, . . . and to be construed as to do substantial justice.'"  *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d at 1252 (quoting Fed.R.Civ.P. 8(e), (f)); *see Seattle-First*, 800 F.2d at 1011 (noting "the importance of reading Rule 9(b) in conjunction with the pleading requirements of Rule 8" (citing 5 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1298 (1969))); *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (stating that the "complaint must provide 'a short and plain statement of

the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.")[23]

With sixty-seven claims set forth in 857 numbered paragraphs, it proves difficult to characterize the Second Amended Complaint as "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Specific descriptions of spills, leaks and other mishaps involving the handling of radioactive and hazardous waste find themselves sandwiched between boilerplate allegations framed in generalized or conclusory terms.  Read literally, each claim for relief incorporates by reference everything that precedes it, with the Sixty-Seventh Claim for Relief thus serving in theory as a single *mega*claim encompassing everything already alleged as to the other sixty-six claims. (*See* Second Amended Complaint at 147-49 ¶¶ 841-857.[24])

Such redundancy is neither "simple," "concise" or "direct."  Court and counsel alike face the daunting task of parsing 150 pages of pleading (excluding exhibits) in search of the essential elements of viable causes of action under the False Claims Act.

The Relators postulate that *every* regulatory infraction at Envirocare's facility involving waste from either private or governmental sources constitutes a presumptively material breach of

---

[23]"Significantly, Rule 8(a) establishes 'a ceiling (the complaint must be no more than "a short and plain statement")' and not 'a floor (the complaint must at least be a "short and plain statement".'"  *Toevs v. Reid*,  2008 WL 598287, *2 (10th Cir. March 4, 2008) (quoting *Frazier v. Ortiz*, Case No. 06-1286, 2007 WL 10765, at *2 (10th Cir. Jan.3, 2007) (unpublished), *cert. denied*, ___ U.S. ___, 127 S. Ct. 3011 (2007)).

[24]Paragraph 844 recites that "Plaintiffs hereby incorporate by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein," all 843 of them. (*Id.* at 147 ¶ 844.)  Perhaps the Relators intend for each portion of the Second Amended Complaint to be read within the context of the entire situation, but wholesale incorporation by reference presents its own problems.  *See, e.g.*, *Byrne v. Nezhat*, 261 F.3d 1075, 1129 (11th Cir. 2001) ("Where, as here, each count incorporates every antecedent allegation by reference, the defendant's affirmative defenses are not likely to respond to a particular cause of action but, instead, to the complaint as a whole. Such disjointed pleadings make it difficult, if not impossible, to set the boundaries for discovery.").

-37-

Envirocare's federal waste disposal contracts.  From that premise, coupled with the fact that Envirocare has received payments under its contracts, the Relators infer that *none* of the violations has been reported or disclosed by Envirocare, and that *every* payment request submitted by Envirocare must have falsely certified its contractual compliance.  Within that context, it may seem to the Relators that requiring them to identify discrete payment requests, reports or certifications that are materially false would serve only to needlessly rehearse the factual footing for their existing global allegations that *all* such submissions were false.

Yet Rule 9(b) demands particularity, not generality, and cannot be satisfied by conclusory allegations as to method and process.  In the context of a *qui tam* claim under the FCA,

> "Underlying schemes and other wrongful activities that result in the submission of fraudulent claims are included in the 'circumstances constituting fraud and mistake' that must be pled with particularity under Rule 9(b)."  *Karvelas*, 360 F.3d at 232. However, unless such pleadings are "linked to allegations, stated with particularity, of the actual false claims submitted to the government," *id.*, they do not meet the particularity requirements of Rule 9(b).

*Regence Bluecross*, 472 F.3d at 727.

Even Rule 8(a)'s requirement of a "short and plain statement" requires at least a minimal factual showing supporting the pleaded claim.  In *Bell Atlantic Corp. v. Twombly*, --- U.S. ----, 127 S. Ct. 1955, 1974 (2007), the Supreme Court announced a new—or at least, a clarified—Rule 8(a) pleading standard: to withstand a motion to dismiss, a complaint must contain enough allegations of fact "to state a claim to relief that is plausible on its face."  Under this revised standard, "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these*

claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)

(emphasis in original).  The Rule places the burden on the plaintiff to frame a "complaint with

enough factual matter (taken as true) to suggest" that he or she is entitled to relief.  *Twombly*, 127

S. Ct. at 1965. "Factual allegations must be enough to raise a right to relief above the speculative

level."  *Id.*  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do."  *Id.* at 1964-65.

      As the court of appeals recently explained:

> The most difficult question in interpreting *Twombly* is what the Court
> means by "plausibility."  The Court states that the complaint must contain
> "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 1974.
> But it reiterates the bedrock principle that a judge ruling on a motion to dismiss
> must accept all allegations as true and may not dismiss on the ground that it
> appears unlikely the allegations can be proven. "[A] well-pleaded complaint may
> proceed even if it strikes a savvy judge that actual proof of those facts is
> improbable, and 'that a recovery is very remote and unlikely.'"  *Id.* at 1965
> (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90
> (1974)).  Thus, "plausible" cannot mean "likely to be true."  Rather, "plausibility"
> in this context must refer to the scope of the allegations in a complaint: if they are
> so general that they encompass a wide swath of conduct, much of it innocent, then
> the plaintiffs "have not nudged their claims across the line from conceivable to
> plausible."  *Id.* at 1974.  The allegations must be enough that, if assumed to be
> true, the plaintiff plausibly (not just speculatively) has a claim for relief.

*Robbins v. Oklahoma*, ___ F.3d ___. 2008 WL 747132, *2 -*3 (10th Cir.  March 21, 2008)

(footnote omitted).  "This requirement of plausibility," *Robbins* continues, "serves not only to

weed out claims that do not (in the absence of additional allegations) have a reasonable prospect

of success, but also to inform the defendants of the actual grounds of the claim against them."  *Id.*

"Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy

the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds'

on which the claim rests." *Twombly*, 127 S. Ct. at 1965 n.3.  And "there must be some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation." *Phillips v. County of Allegheny*, 515 F.3d 224, 234-35 (3d Cir. 2008).

> Put another way, in light of *Twombly*, Rule 8(a)(2) requires a "showing" rather than a blanket assertion of an entitlement to relief. We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only "fair notice," but also the "grounds" on which the claim rests.  *See Twombly*, 127 S.Ct. at 1965 n. 3.

*Id.* at 232.

*Twombly*'s revised pleading standard necessarily reduces the inherent tension between Rule 8 and the particularity requirement of Rule 9(b).  "After *Twombly*, it is no longer sufficient to allege mere elements of a cause of action; instead 'a complaint must allege facts suggestive of [the proscribed] conduct.'"  *Id.* (quoting *Twombly*, 127 S. Ct. at 1969 n.8).  Rule 9(b), in turn, requires that a complaint alleging fraud must allege *particular* facts suggestive of *fraudulent* conduct.  *See, e.g., Siertotwicz v. New York City Housing Authority*,  2006 WL 842561, *7 (E.D.N.Y. 2006) ("Under Rule 9(b), the Plaintiffs must state with particularity the specific statements or conduct giving rise to the fraud claim.").

Like so many legal questions, "the degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on *context*: "Context matters in notice pleading.  Fair notice under Rule 8(a)(2) depends on the type of case. . . ."  *Robbins*, 2008 WL 747132, at *3 (quoting *Phillips v. County of Allegheny*, 515 F.3d at 232) (emphasis added).  *Twombly* "focuses our attention on the 'context' of the required short, plain statement."  *Phillips*, 515 F.3d at 232.

In the context of FCA *qui tam* claims, there must be factual support for the core allegation

that the defendant presented to the United States government a false or fraudulent claim for payment, with knowledge of its falsity or fraudulence. *See United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 329 (S.D.N.Y. 2004) (explaining essential elements of FCA *qui tam* claim).

> Rule 9(b)'s requirement that averments of fraud be stated with particularity–specifying the "time, place, and content" of the alleged false or fraudulent representations, means that a relator must provide details *that identify particular false claims for payment that were submitted to the government*. In a case such as this, details concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices are the types of information that may help a relator to state his or her claims with particularity. These details do not constitute a checklist of mandatory requirements that must be satisfied by each allegation included in a complaint. However, like the Eleventh Circuit, we believe that "*some of this information for at least some of the claims* must be pleaded in order to satisfy Rule 9(b)." *Clausen*, 290 F.3d at 1312 n.21.

*Karvelas*, 360 F.3d at 232-33 (emphasis added & footnotes omitted).

The 857 numbered paragraphs of the Second Amended Complaint—many of them reciting conclusory boilerplate allegations—do not present a "short and plain statement of the claim showing that the pleader is entitled to relief" as required by Rule 8(a)(2). Nor do they state "the circumstances constituting fraud" with the particularity required by Rule 9(b) with respect to Envirocare's alleged submission of false reports and false certifications of contract compliance in conjunction with its payment requests under its federal government contracts.

It is true that courts have found FCA violations "where a defendant falsely certifies compliance with certain conditions required as a prerequisite for a government benefit or payment in order to induce that benefit or payment. . . . In such cases, false certification for the

purpose of receiving a payment or benefit becomes the practical equivalent of a statutory false

claim." *Karvelas*, 360 F.3d at 232 n.15 (citing *Thompson*, 125 F.3d at 902).

As such, the false certification must be pleaded with the requisite particularity under Rule

9(b). Pleading the existence of federal regulatory violations, as well as the *process* by which

false certifications may have been submitted concerning those violations, does not equate with

pleading the submission of an actual false claim. In *Karvelas*, the First Circuit concluded that by

themselves,

> alleged violations of federal regulations are insufficient to support a claim under
> the FCA. *See United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th
> Cir.1996) ("Violations of laws, rules, or regulations alone do not create a cause of
> action under the FCA."); *Clausen*, 290 F.3d at 1311 ("[I]f Rule 9(b) is to be
> adhered to, some indicia of reliability must be given in the complaint to support
> the allegation of *an actual false claim* for payment being made to the
> Government.") (emphasis in the original). While Karvelas does describe the
> procedures allegedly used by the hospital to submit false claims to the United
> States, the alleged existence of such procedures does not permit us to speculate
> that false claims were in fact submitted. *See, e.g.*, *United States ex rel. Walsh v.
> Eastman Kodak Co.*, 98 F.Supp.2d 141, 147-48 (D. Mass. 2000) (dismissing
> complaint under Rule 9(b) where relator set out a methodology by which the
> defendants might have produced false claims without citing an actual false claim).
> As the district court correctly concluded, Karvelas's failure to identify with
> particularity any actual false claims that the defendants submitted to the
> government is, ultimately, fatal to his complaint

360 F.3d at 234-35 (footnote omitted).

Similarly, the Second Amended Complaint remains vulnerable to a Rule 9(b) challenge to

its allegations concerning the *actual submission of false certifications* in conjunction with its

payment requests—even more so where the Relators concede that in fact they do *not* know

whether the alleged regulatory violations were reported by Envirocare or not, or if they were

reported, whether the Government deemed them to be material to the disbursement of payments

to Envirocare under its federal contracts.

Rule 9(b), Rule 11(b) and Rule 8(a) require that such allegations find their footing on something more than mere speculation, conjecture and surmise.  Of course, these Rules do not demand that a *qui tam* relator have perfect knowledge of the facts surrounding a violation of the False Claims Act, especially when many of those facts may be known only to a potential defendant.  A relator may not know or have direct access to the actual content of all of the false reports or false certifications that may have been submitted to the Government, but like other courts, this court believes that "some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)."  *Clausen*, 290 F.3d at 1312 n.21.

Pleading generalized allegations as to such false certifications "upon information and belief," without more, cannot suffice:

> Allegations of the circumstances of a fraud based on information and belief, which are commonplace and often a necessity in many litigation contexts, usually do not satisfy the particularity requirement of Rule 9(b), *unless accompanied by a statement of the facts upon which the pleader's belief is founded*, but the application of the rule may be relaxed as to matters peculiarly within the opposing party's knowledge that the pleader is not privy to at the time the document is being drafted.  For instance, as many cases have recognized, the complaining stockholders in a derivative suit usually have little information or knowledge about the manner in which the corporation's internal affairs are conducted or access to relevant documents and rarely are able to provide details as to the alleged fraud in the complaint.  Yet courts have been understandably reluctant to terminate these actions on a motion addressed to the sufficiency of the complaint.  Even in these cases, however, *the allegations on information and belief should be accompanied by a statement of the grounds on which the pleader's belief rests*. . . .

5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1298, at 248-61

(emphasis added & footnotes omitted).[25]

The fact that the Relators themselves have not *seen* any reports of the alleged regulatory violations by Envirocare, by itself, does not show that in fact no reports or disclosures were made.  Nor must we infer the submission of a false certification of contract compliance from each instance that Envirocare received the full payment it requested under its federal contracts.  Rule 9(b)—and for that matter, Rules 8(a) and 11(b)—demand more than that before Envirocare may fairly be subjected to the burdens of civil discovery and pretrial preparation concerning no less than sixty-seven discrete occurrences.

For these reasons, Envirocare's Rule 9(b) motion should be granted in part with respect to the Second Amended Complaint's allegations concerning the actual submission of false reports and false certifications of contractual compliance.  In addition, this court concludes *sua sponte* that those same allegations fail to comply with Rule 8(a)'s requirement that the pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and Rule 8(d)'s requirement that "[e]ach allegation must be simple concise, and direct."

In the interests of fairness, the Relators will once more be granted leave to further amend their pleading to bring it into compliance with these Rules, subject to specific limitations:

Skip the boilerplate.  Skip the rote "incorporation by reference" of one claim's allegations into another.  Where *process* or *method* remains the same, it need be pleaded only once.  Where submission of an actual false report or false compliance certification is alleged, state with particularity the *content* of the false statement, or if the allegation is pleaded "on information and

---

[25]Indeed, "[t]he importance of providing an explanation of the bases of the allegations in the pleading is emphasized by the fact that it has been held that the district court is limited to the contents of the complaint in determining the pleader's compliance with the Rule 9(b) particularity requirement."  *Id.* at 262-63 (footnote omitted).

belief," set forth a particularized statement of the specific *facts* upon which the pleader's belief is grounded.  Identify each payment request to the specific contract or contracts under which the waste in question was received and payment was sought, and in particular, where "W.R. Grace" waste is at issue, plead FCA *qui tam* claims *only* as to those occurrences involving waste disposed of pursuant to an identifiable *federal* contract, not a private contract—and if the allegation is pleaded "on information and belief," set forth a particularized statement of the specific *facts* upon which the pleader's belief is grounded.

Of course, Rule 10(b) requires that "[a]ll averments ... be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances."  The Rule also specifically requires that "[e]ach claim founded upon a separate transaction or occurrence . . . be stated in a separate count . . . ."  Any document or written instrument annexed to the pleading may be incorporated and may be adopted by reference in different portions of the same pleading under Rule 10(c).

Be simple.  Be concise.  Be direct.

Pay careful heed to Rule 11(b)(3)'s requirement that counsel certify "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . . (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; . . . ."

These constraints are largely rooted in the Rules themselves, and FCA *qui tam* claims that comport with them would likely satisfy Rule 9(b)'s dual concerns that defendants be protected "from spurious charges" and be given notice of the "precise misconduct with which they are

charged," *Ziemba v. Cascade Intern. Inc.*, 256 F.3d at 1202, as well as the expectation of Rules 8(a) and 12(b)(6) that pleaded claims be "plausible" in order for the litigation to proceed. Granting the Relators this further opportunity to amend their pleading affords them the opportunity to proceed on those *qui tam* claims that prove to be plausible under the Rules— claims as to the merits of which the Relators remain entitled to their day in court.

The incidents alleged in the Second Amended Complaint may well constitute regulatory violations, as the Relators insist. But civil liability under the False Claims Act requires more—the *actual submission of a false claim*. Concerning the pleading of that "central element," the Rules demand more than adverse inferences drawn from a lack of information, or a presumption that every regulatory infraction would justify the withholding of payments otherwise due under contract, and that every payment disbursed suggests a violation somehow concealed. As explained above, Rule 9(b) "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payment must have been submitted, were likely submitted or should have been submitted to the Government." *Clausen*, 290 F.3d at 1311. For at least some of their claims, the Relators must allege facts affirmatively showing that Envirocare actually presented a false claim to the Government.

If the Relators have plausible FCA *qui tam* claims against Envirocare that can be pleaded in accordance with the Rules and the limitations prescribed herein by this court, they may plead them now, and proceed with discovery. If they do not, then this litigation may properly be brought to an end.

**CONCLUSION**

This court has wrestled with the issues presented in this case for some time.

At every turn, the court must balance the Relators' interest in having an opportunity to be heard on the merits of their grievances—and the Government's interest in recouping any losses due to fraud—with Envirocare's interest in being spared the burden and expense of litigating claims that as to key elements may be grounded upon little more than speculation and conjecture.

Before sending the Relators back to the drawing board for a fourth time, this court has sought to bring the more problematic aspects of the Second Amended Complaint into sharper focus than was the case in addressing the earlier rounds of dispositive motions in this case. The court has also outlined several practical constraints on further pleading in an effort to avoid any need for yet another round of motions testing the sufficiency of the pleadings. Under Rule 9(b)—and under Rule 8(a) after *Twombly*— pleaded claims must be *plausible* if litigation is to proceed, and to be plausible, the allegations of fact must show the grounds upon which the claims rest. These must be facts that, "if assumed to be true, [show that] the plaintiff plausibly (not just speculatively) has a claim for relief." *Robbins*, ___ F.3d at ___. 2008 WL 747132, at *3.

Sometimes, one good claim is enough.

For the reasons explained above,

**IT IS ORDERED** that Envirocare's Motion to Dismiss Roger Lemmon as Relator in Second Amended Complaint (renewed), filed December 5, 2005 (dkt. no. 115) is DENIED; the Plaintiffs' Renewed Motion for the Substitution of Jolene Lemmon for Relator Roger Lemmon, filed April 14, 2005 (dkt. no. 86), is GRANTED, and Jolene Lemmon is hereby substituted as a

plaintiff pursuant to Fed. R. Civ. P. 25(a), replacing the late Roger Lemmon; Envirocare's

Motion to Dismiss Second Amended Complaint Pursuant to Rule 12(b)(6) (renewed), filed

December 5, 2005 (dkt. no. 116) is GRANTED; and Envirocare's Motion to Dismiss Second

Amended Complaint Pursuant to Rule 9(b), filed December 5, 2005 (dkt. no. 117) is GRANTED

IN PART;

**IT IS FURTHER ORDERED** that pursuant to Fed. R. Civ. P. 8(a)(2), 9(b) and 12(b)(6),

the Second Amended Complaint is hereby DISMISSED without prejudice; and plaintiffs

Lemmon, Cole and Gunderson are hereby granted leave to file an amended complaint within

twenty (20) days of the entry of this Memorandum Opinion & Order, subject to the requirements

of the Rules and the specific pleading limitations set forth hereinabove.

DATED this ___ day of April, 2008.

BY THE COURT:

_____
BRUCE S. JENKINS
United States Senior District Judge

-48-

plaintiff pursuant to Fed. R. Civ. P. 25(a), replacing the late Roger Lemmon; Envirocare's

Motion to Dismiss Second Amended Complaint Pursuant to Rule 12(b)(6) (renewed), filed

December 5, 2005 (dkt. no. 116) is GRANTED; and Envirocare's Motion to Dismiss Second

Amended Complaint Pursuant to Rule 9(b), filed December 5, 2005 (dkt. no. 117) is GRANTED

IN PART;

     **IT IS FURTHER ORDERED** that pursuant to Fed. R. Civ. P. 8(a)(2), 9(b) and 12(b)(6),

the Second Amended Complaint is hereby DISMISSED without prejudice; and plaintiffs

Lemmon, Cole and Gunderson are hereby granted leave to file an amended complaint within

twenty (20) days of the entry of this Memorandum Opinion & Order, subject to the requirements

of the Rules and the specific pleading limitations set forth hereinabove.

    DATED this 9th day of April, 2008.


BY THE COURT:


BRUCE S. JENKINS
United States Senior District Judge

-48-