Steve Russell (#2831)
Jeffrey D. Eisenberg (#4029)
**EISENBERG & GILCHRIST**
215 South State Street, Suite 900
Salt Lake City, Utah 84111
Telephone: (801) 366-9100
Facsimile: (801) 350-0065

Jeffrey W. Appel (#3690)
Janelle P. Eurick (#8801)
**RAY, QUINNEY & NEBEKER**
36 South State Street, Suite 1400
Salt Lake City, UT  84145-0385
Telephone: (801)532-1500
Facsimile: (801)532-7543

Richard D. Burbidge (#0492)
**BURBIDGE, MITCHELL & GROSS**
215 South State Street, Suite 920
Salt Lake City, Utah 84111
Telephone: (801) 355-6677
Facsimile (801) 355-2341

Attorneys for Plaintiffs

---

IN THE UNITED STATES DISTRICT COURT, DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. Jolene Lemmon, as Personal Representative of the Estate of Roger Lemmon, deceased, Patrick Cole, and Kyle Gunderson,<br><br>         Plaintiffs,<br><br>vs.<br><br>ENVIROCARE OF UTAH, now known as ENERGY SOLUTIONS, INC.<br><br>         Defendant. | **THIRD AMENDED QUI TAM COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT AND DEMANDS FOR JURY TRIAL**<br><br>Civil No. 2-02-CV904<br>Judge: Bruce Jenkins |

## INTRODUCTION

1.      Jolene Lemmon as Personal Representative of Roger Lemmon (deceased), Patrick Cole and Kyle Gunderson (collectively termed the "Relators") bring this action on behalf of the United States of America against Envirocare of Utah ("Defendant") for treble damages and civil penalties arising from the Defendant's false statements and false claims, in violation of the Civil False Claims Act, 31 U.S.C. §§ 3729 et seq.

2.      The violations complained of herein arise out of false statements made by the Defendant to the U.S. Government for payment or approval of payment pursuant to certain contracts with the U.S. Government for the disposal of waste, in violation of 31 U.S.C. § 3729(a)(1)&(2).

3.      As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), the Relators have provided to the Attorney General of the United States and to the United States Attorney for the District of Utah a Written Disclosure Memorandum setting forth all material evidence and information related to this Complaint.  The United States declined to join in the litigation.

4.      Thereafter, the Relators opted to continue with the claim on their own as allowed by the False Claims Act.

## JURISDICTION AND VENUE

5.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729 et seq. This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b).  This Court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

6.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c), because the acts proscribed by 31 U.S.C. §§ 3729 et seq. and complained of herein took place in this District, and because at all times material and relevant, Defendant transacted business in this District.

## PARTIES

7.      Relator Roger Lemmon was a citizen of the United States and a resident of the State of Utah.  From approximately September 11, 1998, through October 31, 2000, Lemmon was an employee of Envirocare of Utah. Roger Lemmon died after the filing of this lawsuit.  Pursuant to this Court's Order, Lemmon's wife Jolene Lemmon has been substituted as a party pursuant to Rule 25(a)(1), Fed R.Civ.P.

8.      Relator Patrick Cole is a citizen of the United States and a resident of the State of Nevada. From approximately December of 1998 to June of 2001, Cole was an employee of Broken Arrow, Inc., which was at all material times a contractor for Envirocare.

9.      Relator Kyle Gunderson is a citizen of the United States and a resident of the State of Utah. From approximately August of 1999 to July of 2001, Gunderson was also an employee of Broken Arrow, Inc., which was at all material times a contractor for Envirocare.

10.     The U.S. Government has contracts with Envirocare of Utah ("Envirocare") to dispose of radioactive and other contaminated waste at Defendant's commercial  treatment and disposal facility in Clive, Utah.  Upon information and belief, after the commencement of this litigation, Envirocare was sold and is now known as Energy Solutions, Inc.  For ease of identification, the defendant will continue to be referred to as Envirocare.

11.     The State of Utah has agreements with the U.S. Government to implement and enforce the federal Clean Water Act, the Radiation Control Act, the Low-level Radioactive Waste Policy Amendments of 1985, and the Resource Conservation and Recovery Act, as more fully set forth below.  Additionally, the State of Utah receives at least some of its funding for enforcing and implementing those laws from the U.S. Government.  In this capacity, the State of Utah acts as the U.S. Government's agent, responsible for primary enforcement and implementation of some of the provisions of the federal laws referenced above, while the U.S. Government retains oversight authority.

12.     Envirocare operates a contaminated waste treatment and disposal operation in Clive, Utah at which it disposes of hazardous and radioactive waste pursuant to contracts with the United States of America and other entities, pursuant to federal and state laws, permits and licenses.  Envirocare is paid for such disposal with funds obtained in whole or in part from the U.S. Government pursuant to said contracts.  In addition, Envirocare's continued operation of its treatment and disposal facility is dependent upon, in whole or in part, compliance with federal and state laws, permits and licenses.

13.     Pursuant to the terms of its contracts with the U.S. Government, Envirocare was the prime contractor at the disposal facility and was responsible for all actions of all its subcontractors, including without limitation, Broken Arrow, Inc.

## FACTS COMMON TO ALL CAUSES OF ACTION

14.     From approximately September 11, 1998, through October 31, 2000, Lemmon worked in various capacities at Envirocare, including as a mixed waste equipment operator, a facility coordinator in the Low Activity Radioactive Waste ("LARW") area, and the night project manager and supervisor of a project to dispose of waste arriving from W.R. Grace ("the Grace Project") and other federal and private waste sites.  In these capacities, Lemmon's duties included, among other things, overseeing disposal operations in the LARW area, assisting in writing the Operating Work Permit for the Grace Project ("Grace OWP") and overseeing disposal operations relating to that Project, supervising employees participating in disposal operations, attending meetings with supervisors and management of Envirocare and its

3

subcontractor, Broken Arrow, and writing daily reports regarding the disposal operations which he provided to his superiors

15.     From approximately December of 1998 to June of 2001, Cole as an employee of Envirocare's subcontractor, Broken Arrow, Inc. worked in various capacities at the Envirocare facility assisting in the disposal of contaminated waste.  Among other things, Cole operated the "11e(2) track hoe" and worked as a bulldozer operator in the LARW area and on the Class A cells. Cole also worked as a bulldozer operator for the Grace Project

16.     From approximately August of 1999 to July of 2001, Gunderson, as an employee of Broken Arrow, worked in various capacities at the Envirocare facility assisting in the disposal of contaminated waste.  Among other things, Gunderson worked as a rock truck driver, and in hauling and assisting in the disposal of waste pursuant to the Grace Project as well as from other waste generators.

*Defendant Envirocare's Duty to the U.S. Government*

17.     During the relevant time period Envirocare was one of the only facilities in the United States licensed to receive and dispose of radioactive and other hazardous wastes.

18.     The largest "customer" of Envirocare, by far, was the United States Government.  The government generates radioactive and other hazardous wastes at military and other installations, and also takes responsibility for such wastes in federally funded clean-up operations such as "Formerly Utilized Sites Remedial Action Program" (FUSRAP) and "Superfund" projects.

19.     The safe and permanent disposal of radioactive and other hazardous wastes is of vital concern to the United States Government and a major political and economic issue in this Country.

20.     The service provided to the government by Envirocare, in a nutshell, is the obligation to accept and safely and permanently dispose of radioactive and other hazardous wastes, that no one else wants and which cannot be safely and properly disposed of elsewhere.

21.     In exchange for this service, Envirocare is paid tremendous sums of money from the government, and enjoys a near monopoly on the business of the disposal of radioactive and other hazardous wastes.

22.     To the extent that Envirocare does not fulfill its duty to safely and permanently dispose of radioactive and other hazardous wastes, the government does not receive its "benefit of the bargain."

*Envirocare's Contracts With the U.S. Government*

23.     Beginning in 1991, Envirocare entered into a series of written contracts with the United States Department of the Army, Corps of Engineers, Kansas City District, pursuant to which Envirocare agreed to, and did in fact receive and dispose of contaminated materials from FUSRAP and other governmental and private wastes sites. (Hereinafter collectively, "waste generators.")

24.     The following contracts, among others, were entered into:

      1991 - Contract No. DACW41-01-D-0022;
      1993 - Contract No. DACW41-93-D-9001;
      1997 - Contract No. DACW41-97-R-0023
      1998 - Contract No. DACW41-98-D-9003: and
      1999 - Contract No. DACW41-99-D-9006.

25.     Upon information and belief, all of the contamination events hereinafter alleged occurred during the performance of Envirocare's 1998 and/or 1999 contracts (the Contracts) with the Corps of Engineers.

      During the relevant time period, Envirocare received and disposed of contaminated waste from the following but not limited to the following sites:

Contract DACW41-98-D-9003

| Waste Generator | | U.S. Govt. Payment Office |
|---|---|---|
| Primex Co. | (Illinois) | Rock Island, IL |
| Maywood | (NJ - FUSRAP) | Kansas City, MO |
| Fort Dietrich | (MD) | Rock Island |
| Davis Lab | | Kansas City |
| General Atomics | (GA) | Kansas City |
| Wellsback Mantle Site | (NJ - Superfund) | Kansas City |
| MC/GR Phase VI | (NJ - Superfund) | New York |
| SLAPS (St. Denis Bridge) | (FUSRAP) | Kansas City |
| SLDS | (St. Louis FUSRAP) | Kansas City |
| Wayne | (NJ) | Kansas City |
| DOE-NFS (Nuclear Fuel Service) | | Kansas City |
| Fort McClellan | (AL) | Rock Island |
| Aerojet Ordinance | (TN) | Rock Island |
| Fort Greely | (AK) | Kansas City |
| Camp Evans | (NJ) | Rock Island |
| Elgin AFB | (FL) | Rock Island |
| St. Albans Naval | | Kansas City |

| Fort Hood, Phase II | | Rock Island |
| Colonie | | Kansas City |
| Urban Military Site | (TX) | Kansas City |
| Point Mugis Site | | Rock Island |
| Hunter's Point | | Rock Island |
| Gulf Nuclear Site | | Rock Island |
| US radium, Phase V | | New York |

Contract DACW41-99-D-9006

| Waste Generator | | U.S. Govt. Payment Office |
| --- | --- | --- |
| St. Louis Downtown | (MO - FUSRAP, 11e(2)) | St. Louis |
| Wayne | (NJ - FUSRAP, 11e(2)) | Kansas City |
| Hazelwood Interim Storage (FUSRAP, 11e(2)) | | St. Louis |
| Maywood | (NJ - FUSRAP, 11e(2)) | Kansas City |

26.     The "Grace Project" referred to herein, and on which many of the violations are based was a FUSRAP site, and Envirocare accepted waste from the Grace project as part of Contract DACW41-99-D-9006-0003.  Payments for disposal of the Grace waste came from the U.S. Government, more specifically the Army Corps of Engineers.

27.     Regardless of whether any particular waste stream could be termed "governmental" or "private" if ES was paid by the government for its disposal, the provisions of the Civil False Claims Act apply.

28.     The claims and allegations in this Complaint are limited to those in which payment for disposal of the waste came from the U.S. Government.

29.     In prior Motions to Dismiss, ES has claimed that the "Grace Project," with wastes from Wayne, New Jersey was a private contract and therefore could not be part of a False Claims Act.

30.     However, the Relators have ample documentation of requests for payment, as well as payment from the Government to Envirocare for disposal of FUSRAP waste from the Wayne, New Jersey site.   These payments include, but are not limited to the following:

    A.      9/1 - 9/30/00 Invoices dated 10/6 for $45,672.29 and $65,478.87.
                 Rec'd by KC payment office on 10/10.
                 Paid $111,151.16 on 11/3 (ref. 1231792) by electronic fund transfer (EFT)

    B.      10/1 - 10/31/00  Invoices dated 12/12 for $299,420.03 and $84,468.78.
                 Rec'd by KC payment office on 12/12.
                 Paid $383,888.81 on 1/5/01 (ref. 1379414) by EFT.

C.  10/1 - 1/31/01  Invoice dated 2/9 for $385,015.07.
        Rec'd by KC payment office on 2/12.
        Paid $385,015.05 on 3/8/01 (ref. 1511142) by EFT.

D.  2/1 - 2/28/01  Invoice dated 3/9 for $55,919.58.
        Rec'd by KC payment office on 3/9.
        Paid $55,919.58 on 4/4/01 (ref. 180468) by EFT.

E.  3/1 - 3/31/01  Invoice dated 4/9 for $79,773.19.
        Rec'd by KC payment office on 4/10.
        Paid $79,773.19 on 5/4/01 (ref. 183263) by EFT.

F.  4/1 - 4/30/01  Invoice dated 5/9 for $86,388.52.
        Rec'd by KC payment office on 5/9.
        Paid $86,388.52 on 6/5/01 (ref. 185511) by EFT.

G.  5/1 - 6/30/01  Invoices dated 10/11 for $520,214.58 and $1,243.16.
        Rec'd by KC payment office on 10/18.
        Paid $521,457.74 on 10/2201 (ref. 2154252) by EFT.

*Contractual Requirements*

31.    Pursuant to the specific provisions of the Contracts, Envirocare agreed and was obligated to receive and dispose of the contaminated materials in accordance with all applicable, relevant and appropriate federal, state and local regulations, and in accordance with the Waste Management Plan submitted by Envirocare to the Corps of Engineers.  Those laws and regulations included, but were not limited to, the following:

A.    The Atomic Energy, Act 42 U.S.C. §§ 2011 et seq.;

B.    The Utah Radiation Control Act, Utah Code Ann. §§ 19-3-101 et seq.;

C.    The Low-Level Radioactive Waste Policy Amendments Act of 1985, 42 U.S.C. §§ 2021b et seq.;

D.    The Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq.;

E.    The Utah Solid and Hazardous Waste Act, Utah Code Ann. §§ 19-6-101 et seq.;

F.    The Clean Water Act, 33 U.S.C. §§ 1251 et seq.;

G.    The Utah Water Quality Act, Utah Code Ann. §§ 19-5-101 et seq.;

7

H.    Envirocare's Radioactive Material License Number UT2300249 ("RML UT2300249");

I.    Envirocare's Ground Water Quality Discharge Permit, Number UGW 450005 ("UGW 450005");

J.    The LARW/NORM Construction Quality Assurance/Quality Control Plan ("CQA/QC Plan") for the Envirocare facility (required by RML UT2300249 ¶44);

K.    The LARW Waste Management Plan for the Envirocare Facility (required by RML UT2300249 ¶59);

L.    The Waste Characterization Plan for the Envirocare Facility (required by RML UT2300249 ¶58);

M.    The Operating Work Permit # 00-007, ZC036-01, for the W.R. Grace Project ("Grace OWP");

N.    The Utah Administrative Code R313-18 ("Notices, Instructions and Reports to Workers by License or Registrants, Inspections") and R313-15 ("Standards for Protection Against Radiation").

32.   Pursuant to the specific terms and provisions of the Contracts, Envirocare was obligated to prepare and submit to the Corps of Engineers various written reports which accounted for all contaminated materials received and disposed of by Envirocare. (DACW41-99-D-9006-0003: Section 8 B Execution)

33.   Among other reports, Envirocare agreed and was obligated to prepare and submit to the Corps of Engineers a final report within 30 calendar days after completion of each task order accounting for all materials received and disposed of and disclosing any problems encountered. (Id.)

34.   Envirocare was obligated under the provisions of the Contracts to maintain records sufficient to enable the Government to determine compliance with the provisions of the Contracts, and was further required to report all violations of the contracts, including the violations set forth in the claims for relief below, to the United States Government. (Id. at Section 9 - Notifications)

35.   The Contracts also required Envirocare to provide and maintain an inspection system acceptable to the Government covering Envirocare's services under the Contracts, and also to maintain complete records of all inspection work performed by Envirocare and to make those records available to the Government.  (Id. at Section E B Inspections and Acceptance)

8

36.   If any of Envirocare's services under the Contracts did not conform to the contract requirements, the Government had the right to require Envirocare to perform the services again in conformity with the contract requirements at no increase in contract amounts, or to reduce the contract price to reflect the reduced value of the services performed, or to perform the services itself and charge Envirocare any costs incurred by the Government directly related to the performance of such service. (Id.)

37.   Envirocare also agreed, pursuant to the provisions of the Contracts, to reimburse the Government for any penalties assessed against, all liabilities incurred by, costs incurred by, and damages suffered by the Government, caused by Envirocare's breach of any term of the Contracts or any negligent or willful act or omission of Envirocare or its employees in the performance of the Contracts. (Contract Clause 252.223.7005(b) B Hazardous Waste Liability [Oct. 1992])

38.   Pursuant to the laws, licenses, permits and requirements set forth in paragraph 31, above, Envirocare was required at all material times to submit notifications, reports and documentation to the U.S. Government and/or the State of Utah, including, but not limited to, the Utah Division of Water Quality ("DWQ"), the Utah Division of Radiation Control ("DRC"), the U.S. Environmental Protection Agency ("EPA"), and/or the U.S. Nuclear Regulatory Commissions ("NRC"). Such reports include, but are not limited to, the following:

   A.   <u>Best Available Technology Quarterly Report (UGW 450005 ¶I.H.21)</u>: Defendant was required to submit a quarterly Best Available Technology ("BAT") monitoring report documenting compliance with the BAT performance standards mandated by Defendant's UGW Permit Number 450005;

   B.   <u>Failure to Maintain Best Available Technology Requirements  (UGW450005 ¶I.G.4).</u> In the event that Envirocare failed to maintain the BAT requirements set forth in Parts I.D. and I.E. of UGW 450005, Envirocare was required to provide verbal notification within 24 hours and provide written notice within five (5) days of discovery of the BAT failure In addition, within 5 days of discovery of the BAT failure, Envirocare was required to submit a complete written description of:  a) the cause of the BAT failure; b) any measures taken by defendant to mitigate the BAT failure; c) the time frame of the discovery of the BAT failure and any mitigation measures that were implemented; and d) evidence to demonstrate that any discharge or potential discharge caused by the BAT failure did not and will not result in a violation of the Utah Water Quality Act, Utah Code Ann. §§ 19-5-107;

   C.   <u>Spill Reporting to the Utah DWQ (UGW450005 ¶¶ I.H.4, II.I)</u>: Envirocare was required to report any spill or leakage of waste or waste liquids which came into contact with native soil or ground water and that could endanger public health or the environment as soon as possible, but no later than twenty-four (24) hours after Defendant first became aware of the circumstances.  Within five (5) days of

the time Envirocare first became aware of the spill or leakage, Defendant was required to submit a written notification that contained a) a description of the noncompliance and its cause; b) the period of noncompliance, including exact dates and times; c) the estimated time noncompliance is expected to continue if it has not been corrected; and d) steps taken or planned to reduce, eliminate, and prevent reoccurrence of the noncompliance.  In addition, Envirocare was required to report spills of waste greater than 100kg within 48 hours of discovery and provide a written report of such spills within five (5) working days of discovery;

D.  Leaking Shipment (RML UT2300249, ¶¶ 58, 59; LARW Waste Characterization Plan, p.4; LARW Waste Management Plan, pp.4, 5): Envirocare was required to provide notification whenever a waste was found to contain free liquids, and to provide a written description of the situation within seven (7) calendar days thereafter, in accordance with the requirements of Defendant's Waste Characterization Plan;

E.  Desiccation Cracks in Clay Liner (RML UT2300249, ¶52; UGW 450005, ¶¶I.D.2, I.E.3; LARW CQA/QC Plan, p. 19): Envirocare was required to report and document as a non-conformance item any desiccation cracks larger than one-fourth inch wide and one-inch deep in the clay liner;

F.  Unloading Failure Reports (UGW450005 ¶¶ I.H.7, I.H.10):  Envirocare was required to provide verbal notification within 24 hours of initial discovery of an unloading failure, and submit a written report of the failure within 5 days of said failure.  This notification was required upon the occurrence of the following events where such events could affect the chemical characteristics or volume of a waste discharge:  a) discovery of fluid or waste leakage from the LARW Containers on the storage pad; b) failure of sump pumps or other equipment at the northeast leachate collection and northwest leak detection systems designed to provide free and uninterrupted drainage of the storage pad; and c) any pressures in excess of maximum vehicle, container, or equipment pressure;

G.  Containerized Waste Storage Area Reporting (UGW450005 ¶¶ I.H.10, I.H.12): Envirocare was required to provide verbal notification within 24 hours of initial discovery, and submit a written report within 5 days of the following events, where such events could affect the chemical characteristics or volume of waste discharge: a) failure of the sump pump or other equipment to provide removal of storm water and free and uninterrupted drainage of the pad; and b) any container spill or leakage that may have caused a release to the subsurface soils or ground water via cracks or other damage to the asphalt surface;

H.  Rail Car Wash Facility Reporting (UGW450005 ¶ I.H.20, I.E.14.d): Envirocare was required to report any noncompliance with BAT requirements pertaining to

10

the rail car wash facility in accordance with the then approved BAT performance monitoring plan and BAT contingency plan;

I.   Noncompliance Reporting (UGW450005 ¶II.J.): With regards to instances of noncompliance not required to be reported within 24 hours, Envirocare was required to report all such instances of noncompliance no later than the 15th day of the month following the completed reporting period, as applicable to monitoring reports set forth at Part II.D. of UGW 450005;

J.   Reports of Noncompliance Affecting Radiologic Safety (RML UT2300249 ¶21): Envirocare was required to perform and document weekly inspections of the facility and report any findings of noncompliance affecting radiologic safety. Said items for inspection and reporting were to include, at minimum, operating procedures, license requirements and safety practices;

K.   Reports of Violations of Applicable Rules or License Conditions (RML UT2300249 ¶68): Envirocare was required to provide immediate notification of any waste shipment where there could be a possible violation of applicable rules or license conditions;

L.   Public Health Reporting (UGW450005 ¶II.I.): Envirocare was required to verbally report any noncompliance which could endanger public health or the environment as soon as possible, but no later than 24 hours from the time Envirocare first became aware of the circumstances surrounding such noncompliance. Envirocare was also required to submit a written notification of such noncompliance within five days of the time that it became aware of the circumstances surrounding such noncompliance;

M.   Reports of Exposure (UAC R313-15 and R313-18): Envirocare was required to report any events that did or may have caused radiation exposure to an individual in excess of the limits set forth in the Utah Administrative Code R313-15 and R313-18. In addition, Envirocare was required to report any release of radioactive material, inside or outside of a restricted area, as set forth in Utah Administrative Code R313-15 and R313-18.

N.   Annual As Built Report (UGW450005 ¶I.H.6): Envirocare was required to submit an annual "as-built" report to document construction of the LARW and Class A disposal cells in compliance with the then approved design and specifications as set forth in the LARW CQA/QC Plan.

*Certifications Made by Envirocare to the U.S. Government*

39.     At all material times, Envirocare was required to "sign and certify" all applications, reports or information submitted to the U.S. Government and the State of Utah pursuant to the federal Clean Water Act, as implemented by the Utah Water Quality Act and Envirocare's UGW Permit (UGW 450005 ¶ IV.I).

40.     Envirocare periodically submitted requests for payment to the Corps of Engineers for services allegedly provided under the Contracts.  In each request for payment, Envirocare expressly certified that the payments requested were only for work performed in accordance with the specifications, terms and conditions of the contract, that the quantities of materials reflected in the pay requests were correct and that the quantities and amounts requested were wholly consistent with the requirements of the Contracts.   In reliance upon the certifications, the Corps of Engineers approved and accepted the services performed by Envirocare and then paid Envirocare in full for its services.  (The Federal Acquisition Regulations "FAR" also require that before any Contractor can be paid for services to the government, its services must be accepted as in compliance with all applicable laws, regulations and contractual requirements.  See, FAR 46.5, part 46.501 and 52.232-1)

41.     In instances where Envirocare did not follow or violated one of the provisions of the contracts or requirements set forth in ¶31 and 38, the certifications made by Envirocare were false because Envirocare did not perform its services in accordance with the Contracts, did not properly dispose of all of the contaminated materials received, and/or failed to report such violations, as hereinafter more fully alleged.

*Envirocare Requests For Payment From the U.S. Government*

42.     The disposal of radioactive and hazardous wastes is subject to myriad regulations on several levels including federal, state and local regulations.

43.     Although Envirocare is subject to inspection and monitoring by governmental and administrative agencies, Envirocare has a duty, and the government relies on Envirocare to self-report problems and incidents that constitute violations of its contractual obligations.

44.     The primary reporting requirements of Envirocare are set forth above in ¶31 and 38.  The purpose of the reporting requirements is to demonstrate that Envirocare is operating in compliance with its contractual and other obligations.

45.     In the ensuing causes of action, Relators enumerate specific instances where Envirocare violated its contractual obligations to the government by virtue of:

      A.     Violations of disposal requirements pertaining to the location and/or size of buried debris;

B.      Violations of disposal requirements pertaining to lift thickness and cover;

C.      Violations Pertaining to the Failure to Report and Remediate Spills of Waste;

D.      Violations Pertaining to the Disposal of PCBs;

E.      Disposal of wastes without proper work orders;

F.      Violations of Requirements Pertaining to Exposed Waste Materials;

G.      Violations Pertaining to Failure to Report and Fix Damage to Clay Cell Liners;

H.      Violations of Clay Cover Requirement in Cells; and

I.      Failure to Report Mixing of Wastes

46.      Every incident and occurrence set forth in this Complaint was required to be reported to the government pursuant to Envirocare's contracts, licenses and permits.

47.      None of the incidents and occurrences were reported to the government, and in many cases the contractual violations were knowingly and intentionally concealed.

48.      The submission of required reports without mention of the incidents set forth herein was intended by Envirocare to certify full compliance with its obligation to safely and permanently dispose of the radioactive and hazardous wastes.

49.      The intentional failure to report the incidents and occurrences set forth was to ensure that Envirocare would be paid the full amount claimed under its contracts with the government.

50.      During the relevant time period, the method for submitting invoices to and receiving payment from the government was streamlined, generally consisting of electronic correspondence and wire transfers of funds from the government.

51.      During the relevant time period, Envirocare submitted requests for payment to the government on a periodic basis, usually monthly. During the period in question the persons at Envirocare responsible for submitting the requests for payment (false claims), were its Revenue Accountants Leigh Barrington, Jorden Redford, Christian Colovich, Brandi Gibbons and others.

52.      Every Payment Estimate, known as Certified Pay Estimates By the U.S. Government Army Corps of Engineers, contained a Contractors Request For Payment Certification that expressly certified that the amounts (of money) requested are only for work performed in accordance with the specifications, terms and conditions of the contract.  Each Contractors Request For Payment Certification was signed by an Envirocare Revenue Accountant.

53.     When submitting payment estimates Envirocare's revenue accountants were either unaware, or intentionally failed to disclose the contractual violations set forth in this Complaint.

54.     Thus, Envirocare intentionally submitted false certifications of compliance signed by its Revenue Accountants in order to maintain a level of plausible deniability that it was submitting false claims for payment.

55.     The U.S. Government (Army Corps of Engineers)would not have paid Envirocare for its services without the Contractors Request For Payment Certification that accompanied each Payment estimate submitted by Envirocare.

56.     Requests for payment generally covered specific types of waste disposed over a period of time.  Consequently, the Relators sometimes cannot match an act constituting a false claim to a specific payment request.

57.     The Relators have examined all of the Requests for Payment and reports submitted by Envirocare during the period which is the subject of this Complaint to determine: (a) whether any of the contract violations set forth in this Complaint were reported; and (b) whether payment from the government was withheld or reduced as a result of the violations.

58.     No reports of the numerous and varying types of violations was found to have been made by Envirocare to the U.S. Government.

_Payments to Envirocare By the U.S. Government_

59.     Every request for payment or payment estimate submitted by Envirocare during the relevant time period was paid in full by the United States Government.

60.     Therefore, to the extent the conduct and violations set forth below constitute False Claims under the Act, Envirocare is liable for the liabilities and penalties set forth in the False Claims Act.

_Violations Were Known to Officers and Employees of Envirocare_

61.     During the course of his employment as Project manager for the Grace Project, Lemmon took detailed work logs and reported numerous instances of violations to his superiors at Envirocare and to the managers or responsible persons at Envirocare's subcontractor, Broken Arrow, Inc. (Cole and Gunderson were not required to, and did not keep similar daily work logs.)

62.     On numerous occasions during July-October, 2000, Lemmon was directed by a supervisory employees of Envirocare to cease documenting in his daily work logs any observations that might constitute a violation of requirements imposed upon Envirocare by federal or state laws, licenses, permits or requirements.  Lemmon was also told not to include specific names of

persons involved in contract violations in his daily work logs.  Lemmon received these directives from project managers and supervisors Craig Stewart, Shane Johanson, Santiago Suspiro, Latis Lou Garcia and others. Consequently, the violations listed herein constitute only a small fraction of the violations personally observed by the Relators, but for which more specific information is not available.

63.     By virtue of Lemmon's daily work logs, as well as oral reports of violations from the Relators, and the personal observations of Envirocare agent(s) and employee(s), Envirocare was informed of or otherwise had knowledge of the specific facts, acts and/or omissions that constituted violations of federal or state laws, licenses, permits or requirements set forth in the claims below. Envirocare officers and officials, including those of Envirocare's contractor Broken Arrow, who received information about contract violations include, without limitation, Paul Larson (the Envirocare corporate officer in charge of dispoal operations), Shane Johanson (site manager and Grace project manager), Ty Rogers (site RSO), Carl Thorn, Al Rafferty (Envirocare vice-president), Latis Lou Garcia (site manager), Santiago Suspiro (assistant to Garcia), Craig Stewart, Brian Claymen (health physicist), Wayne Jones (responsible to make lists of problems at Envirocare*), Darryl Delong, Jay Elkins and Jeff Gardner. Officers and officials of Envirocare's contractor Broken Arrow were also informed of contamination events and other contract violations.  These included Steve Wright, Manager, Jay Elkins, Manager, Steve Bunn, owner of Broken Arrow, Lee Gillespie and Reid Bangerter.
* (Jones was subsequently denied access to the information he needed to compile the problem lists by Santiago and Garcia.)

64.     At various times herein, it is alleged that violations were witnessed by agent(s) or employee(s) of Envirocare. Relators did not always record precisely who saw or was aware of the facts alleged herein.  When referred to generally in this manner the agent(s) or employee(s) of Envirocare include those listed in the preceding paragraphs together with Brian Kirkwood (day shift) Troy Thomas (dust suppression), Willie Martinez (dust suppression), Jay Feliz (night maintenance),Travis Sutherland (engineer), Brennon Dick (engineer), Reid Bangerter (engineer), Carl Thurn (engineer), Reed Behling, Scott Green (lab) and Jim Farmer (security). Violations were also witnessed by equipment operators of Envirocare's contractor Broken Arrow. These equipment operators include, but are not limited to Brett Cox, Pat Nickol, Todd Ahlstrom, Lee Gillespie and Jason Gillespie.

_Envirocare's Fraud Against the U.S. Government is Institutional and Pervasive._

65.     The false statements or fraud on the part of defendant Envirocare alleged herein by the Relators is institutional.  That is, contamination events, improper waste disposal, improper cell construction, safety violations and other contract violations witnessed by the Relators and other Envirocare workers were quite common.  It is alleged however, that Envirocare directed, encouraged or allowed the practice of not documenting or reporting these events and other contract violations. As previously noted, when requests for payment and certifications of compliance were made to the U.S. Government (a triggering event for a Qui Tam claim), the

Revenue Accountant(s) submitting the request for payment was more than likely personally unaware of the contract violation.

66.    In the ensuing sections, the Relators set forth specific instances of contract violations that were not reported and thereby constitute a false claim.  It is important to note however, that violations such as burial of improper waste in a cell, improper construction of a cell, use of sand instead of clay between cell layers, etc., would compromise the entire cell, and that thereafter, the burial of any waste in the compromised cell, even if done properly, would constitute a contract violation.

67.    The violations of Envirocare's contractual requirements that follow each constitute a separate breach of Envirocare's obligations under those Contracts.   Envirocare further breached the Contracts by failing to disclose contract violations, by concealing the contract violations from the Government, and by failing to maintain records of the contract violations.

## CLAIMS FOR RELIEF

### A.    Violations of Disposal Requirements Pertaining to the Location and/or Size of Buried Debris

68.    At all material times, Defendant was required to fulfill all requirements and comply with the LARW CQA/QC Plan in disposing of waste. (UGW 450005 ¶¶ I.D.2, I.E.3; RML UT2300249, ¶9.C; ¶ 44).

69.    At all material times, Defendant was required to comply with debris size and location restrictions set forth in RML UT2300249 and incorporated by reference, including but not limited to the following restrictions:

   A.    All debris shall be less than ten inches (10") in at least one dimension, and no longer than twelve feet (12') in any dimension (RML UT2300249, ¶ 52; LARW CQA/QC Plan, as amended by Revision 10a, p.29).

   B.    The final twenty-four inches (24") of the radioactive waste embankment, within the side slopes and the top surfaces, shall be free of debris.  In addition, no debris shall be placed within twenty-four inches (24") of the clay liner (RML UT2300249, ¶53).

   C.    A lift or any portion of a lift shall be limited to less than ten percent (10%) by volume of debris and the debris shall be uniformly distributed horizontally in the lift.  However, debris in the form of concrete, stone or metal may be placed in the lift, up to 25% by volume of the total lift, uniformly distributed horizontally, and the debris placed to minimize void space in the lift. (RML UT2300249, ¶54; LARW CQA/QC, Rev.10).

D.   In the event Defendant accepts for disposal such oversized debris authorized by Condition 55 of RML UT2300249, such oversized debris shall be placed such that the void between the debris can be adequately filled with Controlled Low Strength Material ("CLSM") and the lids of all containers will be removed to allow the CLSM to fill any void space at the top of the container.  Furthermore, the DRC shall be notified at least 48 hours in advance of any CLSM pour.  (RML UT2300249 ¶55; LARW CQA/QC Plan, Rev. 10, p.4).

E.   Waste material placed within 24 inches of the clay liner or radon barrier shall be free of debris. (LARW CQA/QC Plan, Rev. 10a, p.30).

F.   Lifts with oversized debris shall be stacked to form a pyramid with an outside edge that has a maximum 3H:1V slope (LARW CQA/QC Plan, Rev. 10a, p.31).

G.   For non-conforming oversized debris, Defendant shall request authorization from the Executive Secretary for disposal on a case by case basis. (RML UT2300249, ¶55.b).

H.   At all material times, Defendant was required to record, at the time of acceptance, the date and time of day that any lift or portion of a lift was approved as finished by Defendant, in accordance with all specifications and license conditions (RML UT2300249, ¶57).

70.   Those requirements and restrictions are fundamental to Envirocare's duty to the U.S. Government to provide for the safe and permanent disposal of radioactive and hazardous waste.

71.   "Waste cells" are large sections of the facility where wastes are buried, usually segregated by type of waste.

72.   "Waste lifts" are layers of waste within the cells.

73.   The primary duty of Envirocare is to properly construct and fill waste cells, i.e. the appropriate type of waste in cells specifically constructed for that type of waste.

74.   It is only through meticulous adherence to all applicable requirements and regulations that Envirocare  can fulfill its duty to safely and permanently dispose of waste and thereby earn its compensation from the government.

75.   The primary goal of safe and permanent disposal is to keep radioactive and hazardous substances out of the ambient air and water.

76.   These goals are defeated and the services of Envirocare lose value or become worthless when, for example:

17

A.      A cell liner is incorrectly built or is breached allowing seepage of waste outside the cell; or

B.      Waste is left improperly covered or uncovered allowing for the dispersal of toxic or hazardous gases into the air; or

C.      Waste is spilled outside a cell allowing for contamination of the ground, contamination of water through run-off and airborn contamination; or

D.      Waste lifts are improperly constructed or breached leading to increased potential for contamination outside and within the waste cells through seepage, evaporation, or dispersal by wind.

77.     There is nothing ambiguous about Envirocare's contractual requirement to dispose of radioactive and hazardous wastes safely and permanently.

78.     Every violation of the requirements for the construction of waste cells and lifts increases the chance that the disposal of waste at Envirocare is neither safe nor permanent.

79.     Where such violations are frequent, allowed, accepted and unreported the structural integrity of the entire Envirocare facility is called into question.

80.     Moreover, when violations such as those set forth herein go uncorrected and unreported, the integrity of all the waste disposal that follows, no matter how well done, is compromised.

*Specific Violations Pertaining to the Location and/or Size of Buried Debris*

81.     Relators contend that each of the following instances constitutes both a separate incident giving rise to liability under the False Claims Act, and also subjects Envirocare to liability for all waste buried adjacent to or on top of that described herein.

1(a)    In early June, 2000, Envirocare disposed of debris in a restricted area on a disposal lift identified as "D-10".

(b)     On or around June 5, 2000, Lemmon noted in his daily work log that his work crew was digging out debris from a restricted area on lift "D-10'.

(c)     The presence of debris in a restricted area of the D-10 lift was personally observed by Lemmon and the members of the work crew that removed it.

2(a)    On June 30-July 1, 2000, Envirocare failed to do a proper debris calculation to ensure the above requirements were met prior to disposing of debris.

(b)     On June 30, 2000, Lemmon's superior, Shane Johansen, did a debris calculation via his cell phone, without visually inspecting the debris, and instructed Lemmon to proceed with disposing of debris on the "M&N-7 B Kerr lifts."

18

(c)  The Relators allege on information and belief that the debris disposed of on this date did not meet the requirements set forth herein, and that Envirocare was unable to ensure compliance with those requirements by performing a debris calculation via cell phone without a visual inspection.

(d)  On or around June 30-July 1, 2000, Lemmon documented Mr. Johansen's cell phone debris calculation in his daily work log.

3(a)  On July 6, 2000, Envirocare disposed of crushed boxes throughout a waste cell that did not meet the size or volume per lift restrictions set forth herein, and then compounded that violation by covering those crushed boxes with Grace Project waste material.

(b)  On July 6, 2000, Lemmon complained to his superiors including Shane Johansen about the crushed boxes and documented the same in his daily work log. These boxes were personally seen by Lemmon and other Defendant agent(s) or employee(s) working in the cell.

4(a)  On July 8, 2000, Envirocare disposed of boxes that did not meet the size or volume per lift restrictions set forth herein.

(b)  On July 8, 2000, Lemmon complained to his superiors, including Shane Johansen about too many crushed boxes on the cell and documented the existence of the crushed boxes in his daily work log.

5(a)  On August 8, 2000, Envirocare disposed of debris that did not meet the size restrictions set forth herein.

(b)  On August 8, 2000, Lemmon discussed the debris with Brennon Dick, an engineer employed by Envirocare because of concerns that debris in cars numbered DJLX80 & DJLX50 did not meet applicable size requirements for disposal as if it were non-debris waste. Lemmon alleges that the debris significantly exceeded 12' in one dimension.

(c)  On August 8, 2000, Lemmon was instructed by engineer Brennon Dick to dispose of the debris as if it were "normal Grace," and did not require a CLSM pour or notification of the DRC.

(d)  Lemmon documented the debris and instructions relating thereto in his daily work log.

6(a)  On August 11, 2000, Envirocare disposed of crushed boxes on the cells identified as "Q1" and "Q3" that did not meet the size, volume per lift, location or other disposal restrictions set forth herein.

(b)  The inappropriate disposal of crushed boxes as described herein was personally witnessed by Lemmon, Brennon Dick and other agent(s) or employee(s) of Defendant.

7(a)   On August 11, 2000, Relator Lemmon also complained to his superiors and Defendant Engineer Brennon Dick that both the "Q-1" and "Q-3" cells were covered entirely with crushed boxes, in violation of the requirements set forth herein, and were subsequently disposed of as if they were non-debris waste.

(b)   Lemmon documented the disposal of said boxes on the "Q-1" and "Q-3" cells as described herein in his daily work log.

8(a)   On August 15, 2000, Envirocare disposed of boxes that did not meet the size, location, volume per lift or other disposal restrictions set forth herein.

(b)   On August 15, 2000, Lemmon complained to his superiors that there were too many boxes on the disposal cell and documented the same in his daily work log. Lemmon's recollection is that many of those boxes were at least 18-24 inches in one dimension but were disposed of as if they were non-debris waste. Worse yet, and another violation is that some of the boxes were still protruding from the lift after Envirocare approved the lift as meeting disposal requirements.

(c)   The excessive number of boxes, oversize boxes and protruding debris on the cell was personally witnessed by Relator Lemmon and other Defendant agent(s) and employee(s) working on the cell.

9(a)   On August 25, 2000, Envirocare disposed of boxes in a manner that did not meet the volume per lift or other disposal restrictions set forth herein.

(b)   On August 25, 2000, Lemmon complained to his superiors, including Shane Johansen that too many boxes were placed on the cell for disposal as if they were non-debris waste and documented the placement and disposal thereof in his daily work log. Lemmon's recollection is that the boxes exceeded 25% of the volume of the lift and such boxes were disposed of as if they were non-debris waste.

(c)   The disposal of boxes as described herein was personally witnessed by Relator Lemmon and other agent(s) and employee(s) of Defendant who worked in the cell.

10(a)   On September 8, 2000, Envirocare disposed of boxes in a manner that did not meet volume per lift or other disposal restrictions set forth herein.

(b)   On September 8, 2000, Lemmon complained to his superiors, including Shane Johansen, Latis Lou Garcia or Santiago Suspiro that there were too many crushed boxes on the cell to be disposed of as if they were non-debris waste. Lemmon's recollection is that the boxes were, in fact, disposed of as if they were non-debris waste.

(c)   Lemmon documented the disposal of crushed boxes described herein in his daily work log.

11(a)   On  September 15, 2000, Envirocare disposed of boxes that did not meet the size, volume per lift or other disposal restrictions set forth herein.

(b)    On September 15, 2000, Lemmon noted in his daily work log that Defendant had approved the lift, but debris needed to be removed from the lift before any more waste could be placed in the cell.  Lemmon reported that debris, which had been disposed of as if it were non-debris waste, was sticking out of the lift at the time the lift was approved by Defendant.

(c)    The circumstance described above was personally witnessed by Lemmon and agent(s) and employee(s) of Defendant working in the subject cell.

12(a)    On September 22, 2000, Envirocare disposed of boxes that did not meet the size, volume per lift or other disposal restrictions set forth herein.

(b)    On September 22, 2000, Lemmon complained to his superiors, including Shane Johansen, Latis Lou Garcia and/or Santiago Suspiro regarding boxes that did not meet the size restrictions set forth herein and noted the existence of the boxes in his daily work log. It was Lemmon's observation that though many of the boxes ranged from approximately 10" to a foot tall, he was instructed to and did, in fact, dispose of the boxes as though they were non-debris waste.

(c)    The circumstance described above was personally witnessed by Lemmon and agent(s) and employee(s) of Defendant working in the subject cell including, without limitation, Willie Martinez.

13(a)    On October 3, 2000, Envirocare disposed of boxes that did not meet the size, volume per lift or other disposal restrictions described herein.

(b)    On October 3, 2000, Lemmon was instructed by his superiors to dispose of boxes that were over 10" high by placing them in the cell and covering them with Grace Project waste material On that date, Lemmon complained to his superiors and documented the disposal of such boxes in this manner in his daily work log.

14(a)    On October 23, 2000, Envirocare disposed of boxes in a manner that did not meet the volume per lift or other disposal restrictions set forth herein.

(b)    On October 23, 2000, Brian Kirkwood, an employee of Defendant, instructed Lemmon to dispose of crushed boxes on the Grace lifts including the Q-1 cell, as if they were non-debris waste.

(c)    On October 23, 2000, Mr. Kirkwood documented these instructions in a written note to Lemmon. Lemmon's observation was that the crushed boxes were greater than 8" and took up more than 25% of the volume of the lift.

15(a)    On October 23, 2000, Lemmon noted in his daily work log that he was instructed to dispose of boxes on the "Grace lifts" again.

## B.    Violations of Disposal Requirements Pertaining to Lift Thickness and Cover

82.    At all material times, Defendant was required to place radioactive waste in lifts with an uncompacted thickness not exceeding twelve inches (12") (RML UT2300249, ¶49; UGW 450005 ¶¶ I.D.2, I.E.3; LARW CQA/QC Plan, Rev. 10a, p.23).

83.    At all material times, when disposing of waste pursuant to the Grace Project, Defendant was required to spread five truckloads of waste material, followed by one load of clay, with the clay being spread over all exposed waste material to create a minimum cover of at least 2 inches (Grace OWP, ¶6.6.4&5).

84.    At all material times, Defendant was required to record, at the time of acceptance, the date and time of day that any lift or portion of a lift was approved as finished by Defendant, in accordance with all specifications and license conditions (RML UT2300249, ¶57).

_Specific Violations Pertaining to Lift Thickness and Cover_

85.    Each of the following is a separate violation of the disposal requirements set forth above, and may impugn the integrity of all waste thereafter buried adjacent to or on top of that described herein.

1(a)    On July 13, 2000, employees and/or agents of Envirocare instructed Lemmon to "shave off" some elevation on the "Q-3" lift in order to meet the lift thickness requirements This directive was given and the action was taken after the lift was covered with clay material.  The material "shaved off" of "Q-3" consisted of clay "cover", and consequently, the lift was left without the requisite cover material. Thereafter, employees and/or agents of Envirocare disposed of waste directly on top of the "shaved" lift.

(b)    Lemmon noted in his daily work log that elevation was "shaved off" the "Q-3" lift. Also, this event was personally witnessed by Relator Lemmon and other agent(s) and employee(s) of Defendant working on and around the "Q-3" lift at this time.

2(a)    On August 11, 2000, an agent and/or employee of Envirocare instructed Lemmon to "wheel roll" the "Q-1" cell in order to reduce the thickness of the lift.

(b)    Lemmon noted in his daily work log the "Q-1" cell was "wheel rolled" prior to Defendant passing off on the cell.

3(a)    On September 1, 2000, an agent(s) and/or employee(s) of Envirocare approved a lift even though it was 7/10s of an inch over the thickness limitations set forth herein.

(b)    Lemmon noted this incident in his daily work log which was personally witnessed by Lemmon and other agent(s) or employee(s) of Defendant.

4(a)    On September 20, 2000, an agent and/or employee of Defendant instructed Cole and Relator Lemmon to "shave off" elevation on a lift that was too high. On that

       date, Cole shaved the lift to "7/10," then bulldozed down the material that was shaved off of the top of the lift to allow for Envirocare's employees and/or agents to use the material to cover the lift.

(b)     The Relators allege that in "shaving off" the excess elevation, Cole dug into Grace waste material and mixed the contaminated waste with the clay cover material. As a result, when that material was used to cover the lift, it was contaminated with Grace material and did not meet the specifications for "cover" material required by law.

(c)     Relator Lemmon noted the incident in his daily work log.

(d)     This improper action was known to and directed by Shane Johansen, Paul Larson, Jay Ekins and Steve Bunn, among others.

5(a)    On September 28, 2000, Envirocare engineers Brennon Dick, Reed Bangerter and/or Carl Thurn, instructed Lemmon to place waste on lifts in smaller thickness allotments and to "wheel roll" lifts in order to "get back to the correct grade." Lemmon alleges that this action was directed to compensate for lifts previously placed and approved on that cell that exceeded the lift thickness requirements set forth herein.

(b)     Lemmon noted this incident in his daily work log.

## B.(1)   Violations of Disposal Requirements Pertaining to Lift Thickness and Cover Involving Patrick Cole

86.    From approximately December of 1998 to June of 2001, Cole as an employee of Envirocare's subcontractor, Broken Arrow, Inc. worked in various capacities at the Envirocare facility assisting in the disposal of contaminated waste.  Among other things, Cole operated the "11e(2) track hoe" and worked as a bulldozer operator in the LARW area and on the Class A cells. Cole also worked as a bulldozer operator for the Grace Project.

87.    Patrick Cole did not maintain a daily log or other record of his activities.

88.    All of the violations listed below took place during the period encompassed in this Complaint, i.e. June 2000 through June 2001.

89.    The violations of Envirocare pertaining to lift thickness and cover were pervasive. Cole recalls seeing such incidents on a nearly daily basis during his period of employment.

90.    For the claims listed below, Cole does not have an exact date, but could personally direct investigators to the exact location of each violation.  In each case, Cole was ordered to take the action listed by Shane Johansen, Travis Sutherland, Reed Bangerter, Carl Thurn or other supervisors with Broken Aarow.

91.     On several occasions, Relator Cole was instructed by his superiors at Broken Arrow, Inc., and/or Envirocare, to take the following unauthorized actions with respect to the disposal of waste and debris:

1.     Discard oversized debris such as tree stumps, large rocks and other large objects on Saturdays in an unauthorized manner.

2.     Discard oversized debris by burying the debris in lifts and slopes that were already approved by Envirocare so the disposal of oversized debris could not be observed by inspectors.

3.     Bury oversized debris inside the side slopes so that, where a 3:1 slope was required, there would really only be a 1.5 slope and oversized debris would be used to make up the remaining 1.5 slope.

4.     Bury oversized where it was not authorized to be buried, such as within "clean zones," outside slopes, ramps, interior slopes, and lifts that had already been approved, before big inspections.

5.     Build up ramps with oversized debris and boxes, rather than clay or sand. These improper activities involving oversize debris were routine at Envirocare throughout Cole's employment with Envirocare's contractor Broken Arrow, and took place in virtually all of the waste cells at Envirocare. Cole was ordered to bury oversize debris in the manner described above on a regular basis by his superiors Lee Gillespie, Jay Elkins, Steve Wright, Reid Bangerter and Shane Johansen, among others. Orders to bury oversize debris were routinely made by Envirocare and Broken Arrow officials just prior to inspections by regulators.  Cole "learned" to bury oversize debris in the slopes from other operators, including, without limitation, Brett Cox, Pat Nickol, Todd Ahlstrom, Lee Gillespie and Jason Gillespie.

6.     Coat the outside of cells that had plastic and debris sticking up out of the lift with sand to hide the debris.  Cole was ordered to perform this activity in violation of the regulations cited above by his superiors at Envirocare and Broken Arrow.  Again, this activity took place on a regular basis, at least monthly, during Cole's tenure at Envirocare.

7.     Move boxes that were left on a slope full of intermodal resin with a bulldozer, which caused the side of the resin box to rip open and resin to spill out. Cole was ordered to perform this activity in violation of the regulations cited above by his superiors at Envirocare and Broken Arrow.  The spilling of resin due to improper placement and handling was not routine.  Cole participated with other operators

named above in at least one incident on this type on the North end of the West Slope of Cell E-7.

92.    The Relators allege that Envirocare caused such actions to take place and oversized debris and other waste to be buried in an unauthorized manner on a routine basis throughout the Envirocare facility.  Relators allege that upon appropriate inspection and/or testing evidence of these improper activities can be found in the specific locations listed below.

93.    Relators contend that each of the following constitute a separate claim and cause of action for improper disposal of contaminated waste.

1.    Envirocare used oversized debris to create a 3:1 slope on the west edge of the "11e.(2)" cell.

2.    Envirocare buried oversized debris in lift "clean zone" after lift had already been approved, and just before a big inspection, in the corner of the "D-17" cell.

3.    Envirocare buried oversized debris in lift "clean zone" after lift had already been approved, and just before a big inspection, in the bottom of the "P-9" cell.

4.    Envirocare buried oversized debris in lift "clean zone" after lift had already been approved, and just before a big inspection, in the corner of the "H-17" cell.

5.    Envirocare buried oversized debris in violation of size and/or volume restrictions in the "D-10" Cell.  One such violation took place on August 23, and was also personally witnessed by Lemmon and other agent(s) and employee(s) of Envirocare as noted in Lemmon's daily work log.

6.    Envirocare buried waste in "clean zone" or ramp on an interior slope of cell "R-19." (38th Claim for Relief): Envirocare buried waste in "clean zone" or ramp on an interior slope of cell "S-19."

7.    Envirocare buried waste in "clean zone" or ramp on an interior slope of cell "M-19."

8.    Envirocare buried waste in "clean zone" or ramp on an interior slope of cell "N-19."

9.    Envirocare buried waste in "clean zone" or ramp on an interior slope of cell "O-19."

10.   Envirocare buried waste in "clean zone" or ramp on an interior slope of cell "P-19."

11.     Envirocare disposed of boxes in violation of size and volume restrictions, and moved intermodal resin boxes left by day crew with a bulldozer which ripped open the boxes and spilled contaminated resin on the north end, west slope of the "E-7" cell.

12.     Envirocare disposed of boxes in violation of size and volume restrictions throughout the "E-8" cell.

13.     Envirocare disposed of boxes in violation of size and volume restrictions throughout the "E-9" cell.

14.     Envirocare disposed of boxes in violation of size and volume restrictions throughout the "E-10" cell.

15.     Envirocare disposed of crushed boxes in violation of size and volume restrictions, and improperly built up the inside slope ramp with oversized boxes in the "Q-1" East cell. Two such violations took place on August 11 and August 15, 2000, and were also personally witnessed by Lemmon and other agent(s) and employee(s) of Envirocare as noted in Lemmon's daily work log.

## C.     Violations Pertaining to Failure to Report and Remediate Spills of Waste

94.     At all material times, Defendant was required to operate and maintain the LARW facilities, including all waste off-loading, handling, storage and related facilities, to contain and prevent spills of contaminants, including but not limited to taking action to:

A.     Prevent contact of wastes with the ground surface; and

B.     Prevent spills of wastes or liquids contained therein from any contact with the ground surface or ground water. (UGW450005, ¶ I.E.10.a.; RML UT2300249 ¶9.C.)

C.     Prevent contact of surface water or storm water run-off with the waste; and

D.     Control any run-off which may have contacted the waste from subsequent contact with the ground surface or ground water by means of approved engineering containment, and immediately removing any accumulations of such contact run-off or leachates within the confines of a waste off-loading, handling, and/or storage area.  (UGW450005, ¶ I.E.10.a; RML UT2300249 ¶9.C.)

E.     At all material times, Defendant was required to keep wastes and any water or liquids that came in contact with the wastes in contained management and, in the event of a spill of waste or liquids, Defendant was required to "immediately recover

26

the waste and replace it within contained management."  (RML UT2300249, ¶59; LARW Waste Management Plan, p.2, ¶2).

95.   At all material times, Defendant was required to keep wastes, and any water or liquids that came in contact with the wastes, in contained management.  In the event of a spill of waste, Defendant was required to "immediately recover the waste and replace it within contained management." (RML UT2300249, ¶ 59; LARW Waste Management Plan, p.2, ¶2)

96.   At all material times, when disposing of waste pursuant to the Grace Project, Defendant was required to immediately clean up any waste material spilled during unloading, outside of secondary containment or outside of any area designated for waste, prior to continuing with any further activities. (OWP, ¶5.11.1; OWP rev. 1, 5.11.1; Attachment 1 to EC-0675, ¶2 (5/2/00)

*Specific Violations Pertaining to Waste Spills*

97.   Each of the following is a separate violation of the requirements set forth above:

1.   (a)  On  July 14, 2000, Envirocare caused a spill of contaminated waste material on the haul road and failed to immediately clean up or timely report the spill.
(b)  Lemmon personally observed the spill and documented it in his daily work logs.

2.   (a)  On August 22, 2000, Envirocare caused leachate water to be spilled outside of the "berm" and failed to immediately clean up or timely report the spill.
(b)  On August 22, 2000, employees and/or agents of Defendant discovered the spill of leachate water. The spill was personally observed by Roger Lemmon, Jay Feliz, Willie Martinez and Charlie (surname unknown) Upon discovery, Lemmon notified his superiors, including without limitation Shane Johansen about the violation and initiated a contingency plan as required by UGW 450005.
(c)  Lemmon documented the spill, which he believed to constitute approximately 20 gallons of leachate water, and the corrective actions taken, in his daily work log.

3.   (a)  On September 12, 2000, Envirocare caused a spill of contaminated waste received from the "St. Louis" generator, and failed to immediately clean up the spilled waste.
(b) On September 12, 2000, Lemmon discovered the spill of waste material. Lemmon believed the waste at issue was spilled by the day shift, who failed to clean up the spill or initiate the contingency plan, as required by federal laws, permits and licenses
(c)  Lemmon, upon discovering the spill, initiated immediate clean up procedures, notified his superior Shane Johansen about the violation, initiated a contingency plan, and documented the spill and corrective actions taken in his daily work log.

4.   (a)  On September 14, 2000, Envirocare spilled "chunks" of waste from the generator W. R. Grace onto the haul road during disposal operations.
(b)  On September 14, 2000, Lemmon discovered the spill of waste material, notified his superiors Shane Johansen, Latis Lou Garcia and/or Santiago Suspiro about the spill and documented the spill in his daily work log. Lemmon also discussed the contamination event with Justin (surname unknown B Broken Arrow employee).

5.   (a)  On October 6, 2000, Envirocare spilled waste from generator W.R. Grace onto the ground between the trailer and the digging area, and failed to immediately clean up or timely report the spill.
(b)  On October 6, 2000, Lemmon discovered the spill of waste on the ground and documented the spill in his daily work log.

6.   (a)  On October 15, 2000, Envirocare caused a spill of waste from generator W.R. Grace onto the haul road while conducting disposal operations, and failed to immediately clean up or timely report the spill.
(b)  This spill of contaminated waste was personally observed by Lemmon and one or more Health Physics employees of Defendant, probably Brain Claymen.
(c)  Lemmon documented the spill in his daily work log.

7.   (a)   During the spring of the year 2001, Envirocare spilled contaminated sand outside of its contained facilities. During the period at issue, Gunderson noticed that contaminated sand was piled against a fence and had forced the fence to bend down, spilling sand into the "clean" area outside of Envirocare's facilities.
(b)  At the time he made the observation, Gunderson initiated a cleanup of the sand and reported it to a superior, one of Defendant's "Health Physics" employees.

98.   Pursuant to federal and state law as well as Defendant's specific permits, licenses and contracts, Defendant was required to report all hazardous waste spills to the U.S. Government.

99.   The Relators are unaware of any evidence that the above spills were reported and therefore allege that Defendant intentionally failed to report these spills.

100.   Each failure to report a spill as required by Envirocare's contracts constitutes a separate claim under the False Claims Act.

101.   Relators make these allegations in support of the claim that Defendant had a pattern and practice of failing to report contract violations to the government.

## D.   Violations Pertaining to the Disposal of PCB's

102.   At all material times, Defendant was required to:

28

A.    Store PCB Waste within the LARW Container Storage Area or permitted Mixed Waste Storage Areas;

B.    Offload and directly dispose of bulk PCB waste within the LARW or Class A Disposal Cell;

C.    Inspect storage areas containing PCB waste daily to ensure the waste is properly stored and containers are not leaking;

D.    Dispose of PCB waste in accordance with the LARW CQA/QC Plan and an applicable Radiation Work Permit.  (UGW 450005, Appendix I, ¶¶ 9-10; RML UT2300249, ¶9.C)

103.    At all material times, in the event of a spill of PCBs, Defendant was required to take such action as was required by the Contingency Plan, Attachment II-6 of its Resource Conservation and Recovery Act, Part B Permit, and 40 CFR 761 Subpart G, which included but was not limited to:

A.    Noting in its operating record the time, date and details of the incident that required implementing the Contingency Plan; and

B.    Within 15 days after the incident, submitting a written report of the incident to the Executive Secretary. (RCRA, Part B Permit, Attachment II-6, Contingency Plan, ¶ 8.j).

104.    At all material times, Defendant was required to immediately implement the Contingency Plan in the event of a spill of waste materials, and immediately recover any waste materials spilled in the Intermodal Unloading Facility (RW 2.2, "NORM/LARW Incoming Waste Unloading and handling at the Intermodal Unloading Facility," Rev. 04/28/99, ¶ 5.2.4).

_Specific Violations Pertaining to the Disposal of PCB's_

105.    Each of the following is a separate violation of the disposal requirements set forth above:

(a)    On August 29, 2000, Envirocare caused a spill of PCBs in the Intermodal Unloading Facility, failed to immediately clean up the PCBs, and dumped sand on the PCBs as a corrective action.

(b)    This violation was personally observed or known about by Lemmon, Darryl Kelly and Troy Thomas or Willie Martinez (dust suppression).

(c)    Lemmon documented the spill of PCBs and the corrective action taken in his daily work log.

106.    Envirocare also intentionally failed to report the spill of PCBs to the U.S. Government.

**E.    Violations For Disposal of Waste Without Proper Work Orders and/or Without Legible Bates Stickers**

107.    At all material times, Defendant was required to limit the disposal of waste in the LARW Disposal Cells to those radioactive materials authorized by RML UT2300249.  (UGW 450005, ¶I.E.1.a; RML UT2300249, ¶9.C).

108.    In order to ensure that it disposed only of authorized wastes at its facility, Defendant was required to collect and analyze waste samples in accordance with its LARW Waste Characterization Plan.  (UGW 450005, ¶¶ I.E.2.a, I.F.8.a; RML UT2300249, ¶¶ 9.C., 58).

109.    At all material times, Defendant was required to clearly identify the locations of wastes from different generators that were stored or unloaded within its waste storage and related facilities. (UGW 450005, ¶ I.E.10.a.7; RML UT2300249, ¶¶ 9.C, 59; LARW Waste Management Plan, p. 4) Specifically, Defendant was required at all relevant times to identify such wastes by use of clear and legible placards, signs, or labels, which identified the generator number, the bates number, the dates that said waste or waste container or both entered the controlled area and was placed into temporary storage, and/or the date on which said waste was unloaded (Id.)

110.    At all material times, when disposing of waste pursuant to the Grace Project, Defendant was required to print or write a work order authorizing the unloading of the waste material after the sampling was complete and before the waste was unloaded or disposed of. (OWP, ¶¶ 6.3.1 ¶ 6.3.2).

111.    The Relators were often uncertain of the type and origin of the waste disposed of, due to incomplete or missing work orders, problems with bates stickers on the waste vehicles, etc. Disposal of unidentified or improperly identified waste was common at Envirocare during the subject period. In such instances it may be impossible to trace the violation to a specific transaction, invoice or payment from the government. Such violations therefore impugn the integrity of the entire reporting and accounting system from which Envirocae is entitled to be paid by the Government.

*Specific Violations Pertaining to the Disposal of Waste Without Proper Work Orders and/or Without Legible Bates Stickers*

112.    Each of the following is a separate violation of the disposal requirements set forth above, and may impugn the integrity of all waste thereafter buried adjacent to or on top of that described herein.

1(a)    On June 5, 2000, Envirocare disposed of waste without approved work orders.

30

(b)     On June 5, 2000, Lemmon informed his supervisors including Shane Johansen or Brian Claymen that certain waste disposal cars numbered 98501, 9700, 19068 and 98540 did not have work orders authorizing their disposal. Thereafter, Lemmon was verbally instructed by his superiors to dispose of the waste in those cars despite the lack of work orders.

(c)     Lemmon documented the above referenced disposal of waste without work orders in his daily work log.

2(a)    On August 8, 2000, Envirocare disposed of waste without approved work orders. On that date, Lemmon informed his supervisor, Brian Clayman, that certain cars awaiting disposal did not have work orders.  Thereafter, Clayman verbally instructed Lemmon to dispose of the waste in the cars, despite the lack of work orders.

(b)     Lemmon documented the disposal of waste without work orders in his daily work log.

3(a)    On September 18, 2000, Envirocare disposed of waste without legible bates stickers properly identifying the waste.  As a result of the illegible bates stickers, Lemmon alleges he was unable to affirmatively match the waste disposal cars to the work orders.

(b)     On September 18, 2000, Lemmon complained of the illegible bates stickers to his superior, Brian Clayman, who then instructed Relator Lemmon to proceed with disposal of the waste despite the illegible bates stickers.

(c)     Lemmon documented the illegible bates stickers and the actions taken in response thereto in his daily work log.

4(a)    On September 20, 2000, Envirocare unloaded and disposed of waste from waste disposal cars that had too many bates stickers and, therefore, did not properly identify the waste contained therein.  As a result of the multiple bates stickers, Lemmon alleges he was unable to affirmatively match the waste in the cars to the work orders authorizing disposal.

(b)     On September 20, 2000, Lemmon informed his superiors including Shane Johansen or Paul Larson that there were too many bates stickers on each car and documented the same in his daily work log.

5(a)    On October 22, 2000, Envirocare unloaded and disposed of waste without approved work orders.

(b)     On October 22, 2000, Lemmon informed his supervisor Santiago Suspiro by telephone, that he did not have work orders authorizing the disposal of waste awaiting unloading.  Thereafter, Suspiro gave Lemmon verbal instructions to dispose of the waste despite the lack of work orders.  Suspiro gave Lemmon these instructions over the telephone without having inspected the waste or reviewed any work order.

31

(c)     Lemmon documented the above referenced disposal of waste without work orders in his daily work log.

113.    Pursuant to federal and state law as well as Defendant's specific permits, licenses and contracts, Defendant was required to report all incidences of disposal of waste without proper work orders to the U.S. Government.

114.    The Relators are unaware of any evidence that the above incidences of disposal of waste without proper work orders were reported and therefore allege that Defendant intentionally failed to report these incidents.

115.    Relators make these allegations in support of the claim that Defendant had a pattern and practice of failing to report contract violations to the government.

## F.     Violations of Requirements Pertaining to Exposed Waste

116.    At all material times, Envirocare was required to cover all lift areas containing materials susceptible to wind dispersal with soil-like waste or clean fill material so that exposed materials susceptible to wind dispersal were secured by the end of each working day.  (RML UT2300249, ¶59; LARW Waste Management Plan, p. 17).

117.    At all material times, Envirocare was required to cover all side slopes with soil-like waste or clean fill material so that materials susceptible to wind dispersal were secured.  (RML UT2300249, ¶ 59; LARW Waste Management Plan, p. 17)

118.    At all material times, when disposing of waste pursuant to the Grace Project, Envirocare was required to ensure a dust suppression attendant was present on the disposal cell, and that water was available any time waste material was exposed or not completely covered with clay on the cell.  (Grace OWP, ¶ 5.11.3; Grace OWP Rev. 1, 5.10.3)

119.    The requirements designed to avoid exposed waste are important as a means of preventing both air and water contamination.

120.    Since the Grace waste contains Uranium 233 and Thorium 232, prolonged exposure to air can result in the production of deadly thoron gas.

*Specific Violations Pertaining to Exposed Waste*

121.    Each of the following incidents constitutes a separate violation of the False Claims Act.

1(a)    On June 19 and June 20, 2000, Envirocare left Grace waste material uncovered and exposed for more than 12 hours without a dust suppression attendant or water available on the E-7 cell.

32

(b)     On June 20, 2000, at approximately 8:33 p.m., Lemmon noted in his daily work log that Grace waste material containing uranium 233 and thorium 232 was left uncovered on the E-7 cell.  Lemmon alleges that the Grace Project waste material had been left exposed from the night before and had not been covered by the day shift.

(c)     Lemmon recorded this violation in his daily work log.

2(a)    On June 29-30, 2000, Envirocare left Grace waste material uncovered and exposed for more than 12 hours without a dust suppression attendant or water available on the cell.

(b)     On or around June 29, 2000, at approximately 7:20 p.m., Lemmon noted in his daily work log that Envirocare's employees were covering exposed Grace waste material.  Lemmon alleges that the Grace waste material had been left exposed from the night before and was not covered by the day shift.

3(a)    On October 19, 2000, Envirocare left Grace Project waste material uncovered and exposed for more than 12 hours on the East slope of M-10 without a dust suppression attendant or water available on the cell.

(b)     On October 19, 2000, Envirocare employee Brian Kirkwood provided written instructions to Lemmon to cover Grace waste material that was left exposed from the previous night.  On that date, Kirkwood informed Lemmon that he did not want to stop production on the day shift to cover the exposed Grace Project waste material. Kirkwood therefore knowingly caused or contributed to a violation of the federal requirements set forth herein.

(c)     Lemmon recorded this incident in his daily work log.

4(a)    On October 13, 2000, Envirocare left Grace Project waste material uncovered and exposed for more than 12 hours on Q-1 and M-10 without a dust suppression attendant or water available on the cell.

(b)     On or around October 13, 2000, Lemmon explained the situation to his supervisor Santiago Suspiro about the need to cover Grace waste material that was left exposed from the previous night.

(c)     Lemmon noted in his daily work log that there was an "emergency situation" concerning Grace Project waste that had been left exposed and needed to be covered.

5(a)    On October 23, 2000, Envirocare left Grace Project waste material uncovered and exposed for more than 12 hours on the East slope of M-10 without a dust suppression attendant or water available on the cell.

(b)     On October 23, 2000, Envirocare employee Brian Kirkwood gave Lemmon written instructions to cover some Grace Project material that was left exposed and uncovered for more than 12 hours in the M-10 cell.  Lemmon alleges that Mr.

Kirkwood observed the exposed Grace Project material during the day shift but failed to cover it because he did not want to stop production on the day shift.

6(a)    On October 24, 2000, Envirocare left Grace Project waste material uncovered and exposed for more than 12 hours on the East slope of M-10 without a dust suppression attendant or water available on the cell.

(b)    On October 24, 2000, Envirocare employee Brian Kirkwood provided written instructions to Lemmon to cover Grace Project waste material that was left exposed in the M-10 and P-7 cells for more than 12 hours with a "thin layer of sand." This situation, and the efforts to cover it up were also witnessed by Brennon Dick and others.

## G.    Violations Pertaining to Damage and Failure to Report and Fix Damage to Cell Clay Liners

122.    At all material times, Envirocare was required to prepare, place and compact a clay liner to line the bottom of each LARW cell, according to the specifications set forth in the LARW CQA/QC Plan.  (RML UT2300249, ¶ 44; UGW 450005, ¶ I.D.2; LARW CQA/QC Plan, pp. 2-3).

123.    At all material times, Envirocare was required to report desiccation cracks larger than one-fourth inch wide and one-inch deep in the clay liner to the U.S. Government and/or the State of Utah, and to document such cracks as non-conformance items when discovered (RML UT2300249, ¶ 44; UGW 450005, ¶ I.D.2; LARW CQA/QC Plan, p. 19).

124.    The requirement to report and repair damage to a cell clay liner is vital since damage to the cell liner raises the potential that, when thereafter filled, the integrity of the entire cell will be compromised.

### Specific Violations Pertaining to Failure to Report and Fix Damage to Clay Liners

125.    Each of the following incidents constitutes a separate violation of the False Claims Act.

1(a)    On October 6, 2000, Envirocare damaged and then failed to report or fix damage to a clay cell liner.

(b)    On October 6, 2000, Lemmon noted in his daily work log that the clay liner was damaged.  On that date, Lemmon also notified Envirocare employees of the damaged clay liner.  Lemmon alleges that the damage to the clay liner was of a size that required reporting.

2(a)    On October 19, 2000, Envirocare failed to report a damaged clay liner that was covered with waste material.

34

(b)    On October 19, 2000, Envirocare employee Brian Kirkwood instructed Lemmon in writing to beware of a punctured liner.  On that date, Kirkwood informed Lemmon in writing that the clay liner was punctured and had been covered with waste material the night before The Relators allege that the damage to the clay liner was of a size that required reporting.

(c)    Lemmon's recorded this violation in his daily work log.

126.    Envirocare failed to report the incidents of damaged clay liner described herein to the U.S. Government and/or the State of Utah, and also failed to document the damaged clay liner as a "non-conformance item".

## H.    Violations of Clay Cover Requirements

127.    At all material times, when disposing of material pursuant to the Grace Project, Envirocare was required to comply with the following clay cover requirements:

A.    Following the unloading of five rock truck loads of (Grace Project) waste material on the disposal cell, the material must be spread out and covered with a minimum of one (1) rock truck load of clay to minimize the amount of exposed material. The clay layer shall have a minimum thickness of 2 inches (Grace OWP, ¶¶5.11.2, 6.6.4-6.6.6). (Emphasis added).

B.    A stockpile of clay shall be established adjacent to the disposal cell for use in the event of sudden weather changes (e.g. high winds) that would require immediate covering of exposed waste material (Grace OWP, ¶ 5.11.4).  (Emphasis added).

*Specific Violations Pertaining to Clay Cover Requirements*

128.    Each of the following incidents constitutes a separate violation of the False Claims Act.

1(a)    On September 18, 2000, Lemmon noted in his daily work log that Marianne Gordon, a Broken Arrow supervisor, informed him that she was instructed by her superior, Jay Ekins, to use sand to cover a lift.

2(a)    On September 20, 2000, Lemmon met with Envirocare managers Shane Johansen and Paul Larsen and Broken Arrow managers Jay Ekins and Steve Bunn. At that meeting, Lemmon was instructed by those managers to "try not to go too deep on sand" when covering the lifts. This instruction demonstrates that Envirocare was using sand, rather than clay, to cover the lifts of waste.

(b)    Lemmon noted in his daily work log the meeting and discussion referenced herein, and that his work crew had covered a lift of Grace waste with 2 inches of sand, rather than 4 inches clay.

3(a)   On September 26, 2000, Envirocare used sand from a sand pit owned or operated by Broken Arrow, Inc., in the west desert as clay "cover" material to cover a lift of Grace material.

(b)   On September 26, 2000, Lemmon noted in his daily work log that his work crew was using sand from outside the restricted area as "cover" material.

(c)   Use of sand from Broken Arrow rather than clay was personally observed by Lemmon and other agent(s) and employee(s) of Envirocare who harvested the sand.

4.   On October 6, 2000, Lemmon noted in his daily work log that his work crew used sand from a sand pile to cover a lift of waste material.

5(a)   On October 9, 2000, Lemmon noted in his daily work log that his work crew obtained sand from outside the area to use to stockpile and use as "cover" for waste material.

(b)   Use and stockpiling of sand from outside the area rather than clay was personally observed by Lemmon and other agent(s) and employee(s) of Envirocare who harvested the sand. Lemmon's notes state there were seven Broken Arrow personnel at work.

6(a)   On October 23, 2000, Brian Kirkwood instructed Lemmon in writing to "please cover the whole side slope, east slope of M-10 has exposed Grace, with thin layer of sand." (Emphasis added).

(b)   On October 24, 2000, Lemmon noted in his daily work log that his work crew covered the east slope of "M-10" with sand and more than half of the "P-7" lift with sand.

129.   The Relators allege that pursuant to the requirements set forth in paragraph 31, above, Envirocare submitted an annual "As-Built" Report to the U.S. Government's agent, the State of Utah, for the year 2000 that documented construction of the LARW and Class A Disposal Cells in compliance with the specifications set forth in the LARW CQA/QC Plan.  In so doing, Envirocare knowingly made a false statement and certification to the U.S. Government that it had complied with the requirements set forth in the LARW CQA/QC Plan.

**Summary**

130.   The numerous violations detailed in paragraphs 68-129 are all material violations of Envirocare's contracts with the U.S. Government.

131.   None of the violations were reported to the U.S. Government as required by the contracts.

132.    Instead, in every "Payment Estimate" submitted by Envirocare, it certified that the amounts (of money)requested were only for work performed in accordance with the specifications, terms and conditions of the contract.

133.    Consequently, the Payment Estimates which cover the dates of the violations detailed herein constitute false claims to the U.S. Government.

## PRAYER FOR RELIEF

WHEREFORE, the Relators respectfully request this Court to enter judgment against the Defendant as follows:

1.    That the United States Government be awarded damages in the amount of three times the damages sustained by the Government because of the false claims and fraud alleged within this Compliant, as the Civil False Claims Act, 31 U.S.C. §§ 3729 et seq. provides;

2.    That civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the U.S. and/or its grantees;

3.    That pre-and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pressing this case;

4.    That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations for which redress is sought in this Complaint;

5.    That the Relators be awarded the maximum amount allowed to them pursuant to the False Claims Act; and

6.    That this Court award such other and further relief as it deems proper.

## DEMAND FOR JURY TRIAL

The Relators, on behalf of themselves and the United States, demand a jury trial on all claims alleged herein.

DATED this 16th day of May, 2008.

EISENBERG & GILCHRIST


s/ Steve Russell
Steve Russell
Jeffrey D. Eisenberg

RAY, QUINNEY & NEBEKER
Jeffrey W. Appel
Janelle P. Eurick

BURBIDGE, MITCHELL & GROSS
Richard D. Burbidge

38